Argued and submitted October 5, 1992, affirmed in part and reversed in part
August 25, 1993

OREGON STATE SHOOTING ASSOCIATION,
John Nichols, dba Nichols Firearms,
Rose City Promotions, Inc.,
dba Rose City Gun Collectors,
and Kenneth W. Glass,
*Appellants,*
*and*

SECOND AMENDMENT FOUNDATION,
*Plaintiff,*

*v.*

MULTNOMAH COUNTY,
a political subdivision of the State of Oregon,
Robert G. Skipper, in his capacity as
Sheriff of Multnomah County,
City of Portland,
and Richard D. Walker, in his capacity as
Chief of Police of the City of Portland,
*Respondents.*

(A9008-04628; CA A72067)

858 P2d 1315

542

John A. DiLorenzo, Jr., Portland, argued the cause for appellants. With him on the briefs was O'Connell, Goyak & DiLorenzo, Portland.

Jeffrey L. Rogers, City Attorney, Portland, argued the cause and filed the brief for respondents City of Portland and Richard D. Walker.

Laurence Kressel, Multnomah County Counsel, Portland, argued the cause and filed the brief for respondents Multnomah County and Robert G. Skipper.

Jacob Tanzer and Ball, Janik & Novack, Portland, filed a brief *amicus curiae* for Oregonians Against Gun Violence and Center to Prevent Handgun Violence, Legal Action Project.

Nick Albrecht, Portland, and Robert Dowlut, Washington, D.C., filed a brief *amicus curiae* for Firearms Civil Rights Legal Defense Fund.

De MUNIZ, J.

Edmonds, J., concurring in part; dissenting in part.

## De MUNIZ, J.

Plaintiffs seek a declaratory judgment regarding the validity and constitutionality of provisions of Multnomah County Ordinance 646 and of City of Portland Ordinance 163299. The trial court issued a 25 page opinion in ruling for defendants. Plaintiffs appeal. We affirm in part and reverse in part.

In 1990, Multnomah County and City of Portland adopted ordinances concerning firearms. City of Portland Ordinance 163299 provides for collection of a $15 fee from firearms dealers to cover the cost of criminal record checks of prospective handgun purchasers mandated by ORS 166.420. Multnomah County Ordinance 646 requires a $15 fee for background checks of a firearms purchaser. It also classifies certain firearms as "assault weapons," prohibits their possession for sale at the Exposition Center and provides that no person shall possess an "assault weapon in a public place," unless it is being transported in a specified manner. The trial court held that the ordinances are not preempted by state law and that the firearms listed in the Multnomah County ordinance are not arms protected by Article I, section 27.[1]

First, we address the issue of jurisdiction. A court may consider its jurisdiction to enter a declaratory judgment, even though the issue was not raised by either party. *Gaffey v. Babb*, 50 Or App 617, 620, 624 P2d 616, *rev den* 291 Or 117 (1981). A proceeding under chapter 29 must be more than a request for an advisory opinion; as an exercise of the "judicial power" under Article VII (amended), section 1, it requires a justiciable controversy between the parties. *LaGrande/Astoria v. PERB*, 281 Or 137, 139 n 1, 576 P2d 1204 (1978). A justiciable controversy exists when there is an actual and substantial controversy between parties with adverse legal interests, and the controversy must involve present facts rather than future events or a hypothetical issue. *Cummings Constr. v. School Dist. No. 9*, 242 Or 106, 110, 408 P2d 80

---

[1] Article I, section 27, provides:

"The people shall have the right to bear arms for the defence [*sic*] of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]"

(1965). We conclude that the interests of plaintiffs and defendants are sufficiently adverse and that there is an actual and substantial controversy.

■ Sections IV A(1)-(3) of the county ordinance regulate the possession of certain assault weapons in public places. Plaintiffs assign error to the trial court's ruling that the semi-automatic rifles, semi-automatic pistols and specified shotguns listed in the county ordinance are not protected by Article I, section 27.[2] The trial court concluded that, because Oregon pioneers were aware of repeating rifles, the listed weapons are "arms" within the meaning of Article I, section 27, but that they are not entitled to constitutional protection, because they "originated as or evolved from military ordnance." *See State v. Kessler*, 289 Or 359, 369, 614 P2d 94 (1980). Plaintiffs argue that that analysis is erroneous, because the weapons are modern day equivalents of the type of weapons used by colonial militiamen and are personal, not military, weapons.

■■ As formulated by the Supreme Court, the inquiry for whether a weapon is within the meaning of "arms" in Article I, section 27, is whether the weapon,

"as modified by its modern design and function, is of the sort commonly used by individuals for personal defense during either the revolutionary or post- revolutionary era or in 1859 when Oregon's constitution was adopted." *State v. Delgado*, 298 Or 395, 400, 692 P2d 610 (1984) (footnote omitted); *see also State v. Kessler, supra.*

Under that test, a weapon must satisfy three criteria: (1) although the weapon may subsequently have been modified, it must be "of the sort" in existence in the mid-nineteenth century; (2) the weapon must have been in common use; and (3) it must have been used for personal defense. The weapons at issue here fail these tests.

The parties presented a battle of the experts to prove that the weapons were or were not of the "sort" used in mid-nineteenth century.[3] The Supreme Court has not articulated

---

[2] Plaintiffs make no federal constitutional argument.

[3] The Supreme Court has not indicated what sources should be accepted to determine historical "facts." Clearly, the court does not limit the inquiry to primary sources, but it has not stated what standard secondary sources must meet. In its

what theory underlies how that final determination is to be made. In one instance, the court has described the analysis as a search for a "pre-twentieth century form or counterpart." *State v. Delgado, supra*, 298 Or at 404 n 8. However, "form" and "counterpart" do not mean the same thing. "Form" is a nebulous concept. The definitions in *Webster's Third New International Dictionary* 892 (unabridged 1971) include: "image, representation"; "the shape and structure of something as distinguished from the material of which it is composed"; and "the ideal or intrinsic character of anything or something that imposes this character." The trial court appeared to accept "form" as the rationale on which it based its conclusion that, despite the fact that the technology for automatic weapons did not exist until the twentieth century, the listed weapons are equivalent to those known by the pioneers. The dissent concurs with that basis.[4]

■ However, the Supreme Court also referred to the analysis as a search for a "counterpart." That is a more concrete term than "form." *Webster's Third New International Dictionary, supra* at 520, includes in the definition of counterpart "a thing that may be applied to another thing so as to fit perfectly," and "a person or thing so like another as to seem a duplicate." Under those definitions, the technology by which automatic weapons operate precludes a finding that a semi-automatic weapon is a "counterpart" of a mid-nineteenth century repeating rifle.

■ The Supreme Court has shown that technological advancement is a factor in considering whether arms come

---

memorandum opinion, the trial court also noted the lack of a standard by which to measure what historical sources should be accepted:

"I have difficulty accepting [P. Cleator, *Weapons of War* (1967) cited in *State v. Kessler, supra*] as anything other than an interesting and generalized survey. Its 208 pages purport to cover the entire history of weaponry, from ancient Paleolithic (Stone Age) weapons to nuclear bombs of the 1950's. Mr. Cleator has written at least 15 books, concentrating primarily on archaeology and space. *See, e.g., Archeology in the Making* (1976) and *An Introduction to Space Travel* (1961). His survey of weapons is long on historical anecdotes and trends but short on precise dates. The experts who testified in this case were far more specific and precise. Yet, because the Oregon Supreme Court has relied on Cleator's work, I have referred to it also."

[4] If a "form" is all that is required, nuclear missiles are technologically advanced equivalents of catapults.

within the constitutional protection of section 27. In *State v. Delgado, supra,* the court was confronted with the technology that had advanced a jackknife to a switch-blade. The court noted that, because there were general technological changes in weaponry as there were in tools during the mid-nineteenth century, "[t]he addition of a spring to open the blade of a jackknife is hardly a more astonishing innovation than [the development of the Gatling gun, breech loading rifles, metallic cartridges and repeating rifles]."[5] 298 Or at 403.[6] However, while technological advancement does not necessarily mean that a weapon is not "arms" within Article I, section 27, there is a point at which that advancement renders the constitutional protection inapplicable. In *State v. Kessler, supra,* 289 Or at 369, the court held:

"Firearms and other hand-carried weapons remained the weapons of personal defense, but the arrival of steam power, mechanization, and chemical discoveries completely changed the weapons of military warfare. The development of powerful explosives in the mid-nineteenth century, combined with the development of mass-produced metal parts, made possible the automatic weapons, explosives, and chemicals of modern warfare. P. Cleator, *Weapons of War* 153-177 (1967).

---

[5] If the Supreme Court meant that the degree of astonishment is the measure by which to determine the point at which technological advancement takes a weapon beyond the "sort" that existed in mid-nineteenth century, surely the weapons here exceed the necessary degree. Given the nature of the lever action rifle that existed when the constitution was drafted, the drafters surely would have found "astonishing" technological innovations that, for example, have resulted, as the evidence showed, in a semi-automatic rifle with 20 rounds of ammunition, an effective range of 440 to 600 yards and sufficient velocity to easily penetrate objects such as vehicles or buildings before coming to rest.

[6] The trial court took issue with the dicta from *State v. Delgado, supra,* 298 Or at 403, that the drafters

"must have been aware that technological changes were occurring in weaponry as in tools generally. The format and efficiency of weaponry was proceeding apace. This was the period of development of the Gatling gun, breach [sic] loading rifles, metallic cartridges and repeating rifles."

In its opinion, the trial court noted that breech loading rifles came before the Gatling gun and, more importantly, that

"the 50 years of history * * * span *beyond* the Oregon Constitutional Convention: a partially successful breech loading, bolt action rifle was developed in Germany in 1827; metallic rim-fire cartridges developed in the 1840's; primitive mechanical repeating rifles began to emerge in the 1850's and 1860's; the Gatling gun appeared in the 1860's; and reliable mechanically repeating rifles finally emerged in the late 1860's and 1870's." (Emphasis the trial court's; citations omitted.)

"These advanced weapons of modern warfare have never been intended for personal possession and protection. When the constitutional drafters referred to an individual's 'right to bear arms,' the arms used by the militia and for personal protection were basically the same weapons. Modern weapons used exclusively by the military are not 'arms' which are commonly possessed by individual for defense[;] therefore, the terms 'arms' in the constitution does not include such weapons."

■ In the light of the Supreme Court's analyses, we conclude that the resolution of whether a weapon is of the "sort" known in the mid-nineteenth century involves more than parsing through the evolution of a particular weapon. Article I, section 27, protects the right to bear arms in defense of self and in defense of the state. The Supreme Court has recognized that, when the constitution was drafted, those arms were the same. Technology has now defined a difference between personal weapons for defense of self and weapons of warfare. The court has concluded that the determination of what weapons come within the constitutional provision encompasses consideration of whether the drafters would have intended the constitutional protection to apply if they had envisioned the technological advancements and the reasons for which those advancements were made.

The dissent acknowledges that "[t]he listed firearms may look like military weapons or may have taken their design from military weapons" but finds that irrelevant because "so too did the firearms possessed by militiamen and civilians in the mid-nineteenth century." 122 Or App at 558. That statement ignores the Supreme Court's determination that there is a point at which weapons for self-defense and military purposes ceased to be the same and that advanced weapons of military warfare were never intended for personal possession and protection.[7]

The trial court cited plaintiffs' exhibit of a study by the United States Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms that included many of the weapons at issue here. That study noted that the only real

---

[7] While we are aware that the name of a weapon does not determine the constitutional protection, *see State v. Delgado, supra,* 298 at 400, the listed weapons are called assault weapons for a reason.

difference between the civilian and military weapons is that the civilian models supposedly are not capable of fully automatic fire.[8] The trial court found that "[t]he record in this case establishes that virtually all of the Ordinance 646 weapons originated as or evolved from military ordnance." Even plaintiffs' expert conceded that the "original intent of probably two-thirds of the weapons was in military application" and that the weapons are generally copies of military weapons and "are slightly modified and presented in civilian mode." The trial court concluded that the weapons "can be converted readily back into the fully automatic military configuration."[9]

■ The dissent concludes that, because the "semi-automatic firearms may be illegally modified to become automatic weapons * * * is not a reason to deprive them of section 27 protection under the tests adopted by the Supreme Court." 122 Or App at 556, n 2. That is backwards. The weapons have been modified, ostensibly so that they will not be classified as military weapons, which, under the Supreme Court's tests are not entitled to the constitutional protection. Those "modifications" cannot be used to bootstrap these weapons into personal defense weapons so that they come within the constitutional protection. The weapons are not the

---

[8] The dissent does not address the consequences of a single pull on the trigger. For example, the power of the listed Striker 12 or Sweeper has been described:

"The wildest, and perhaps the deadliest, gun on the street looks like the mutant progeny of a coffee can and a giant grasshopper. Its oversize handgun frame is fitted with a folding stock, a forward grip and a large drum magazine. A big butterfly-shaped key protrudes from its face. The gun, developed in South Africa for 'crowd control' of a brutal and bloody sort, is called the Striker 12 or the Street Sweeper. With importation also banned, two American companies now produce the gun.

"The Street Sweeper is basically a large revolver whose drum cylinder holds 12 shotgun shells. The key winds a spring that keeps the cylinder under tension. As the trigger releases after the gun is fired, the spring quickly rotates the cylinder for the next shot, greatly increasing the rate of fire. The Street Sweeper can discharge 12 shells in a few seconds, spewing as much lethal fire across a wide area as rapidly as any machine gun." Anderson, "Street Guns: A Consumer Guide," New York Times Magazine, February 14, 1993, at 23.

[9] A recent article points out the ease of that conversion. The Bureau of Alcohol, Tobacco and Firearms has decided that the MAC-10, one of the weapons here, is actually a submachine gun because it may be converted to automatic fire by using nothing more sophisticated than a paper clip. Anderson, "Street Guns: A Consumer Guide," New York Times Magazine, February 14, 1993, at 21.

"sort" of weapons for defense of self intended by the drafters to come within Article I, section 27.

The dissent is incorrect that our conclusion that the semi-automatic weapons are not constitutionally protected is based solely on technological developments. Even if the listed weapons could be said to be the "equivalent" of mid-nineteenth century repeating firearms used for self-defense, such firearms were not in common use at that time. To meet that test, plaintiffs relied on the existence in the mid-1850's of a manually operated repeating rifle known as the Volcanic, some of which may have been in the Oregon Territory. However, the evidence showed that the Volcanic had trouble in detonating and was not commercially successful. That rifle was produced from 1855 to 1857, when the company went into receivership. From 1857 to 1860, the company produced about 3,200 firearms that retained the basic features of the earlier Volcanic rifles. The Henry repeating rifle was not introduced until 1860, after the 1859 approval of the Oregon Constitution. On the record, the trial court concluded that

> "there was no such thing as an automatic firearm in the 1850's either in Oregon or elsewhere. The best the firearms industry could produce at the time were primitive, manually operated repeating weapons. * * * It was not until 1862 that this country 'saw the first commercially available successful lever action repeating rifle * * *.' [Defendants' expert's affidavit]."

We hold that the weapons listed in Multnomah County Ordinance 646 are not "arms" within the meaning of Article I, section 27.[10]

Plaintiffs also assign as error the trial court's ruling that Section IV(4) of the county ordinance, which prohibits any person from possessing an assault weapon in the Exposition Center for purposes of sale, is not preempted by state law. The question is whether the county ordinance is in conflict with state law because the ordinance forbids conduct that

---

[10] The dissent concludes that our decision, "[t]aken to its logical extension[,] * * * means that the government can make unlawful the possession of a 22 semi-automatic rifle that a 12-year-old child receives as a birthday gift or the semi-automatic pistol that is used by the target shooter." 122 Or App at 559. Those weapons are not before us. If they were, we do not assume that the dissent presumes that the constitutional protection to be afforded them is to be determined by birthday gifts or sporting needs.

plaintiffs allege is permitted by state law. *See City of Portland v. Jackson*, 316 Or 143, 146, 850 P2d 1093 (1993). To answer that question, we must first examine the ordinance and statute claimed to be in conflict and determine what conduct the ordinance prohibits. Then we determine whether the statute permits that conduct, either by an express legislative decision, by a decision apparent in the legislative history or otherwise. If the ordinance prohibits conduct that the statute permits, the laws are in conflict and the ordinance is displaced. 316 Or at 151.

The legislation that plaintiffs claim has preempted the ordinance was enacted in 1989, in House Bill 3470,[11] and has been referred to as the "Katz Act." That legislation was a comprehensive revision of state law concerning the possession and sale of firearms. Section 38, codified as ORS 166.245, provides:

> "Except as otherwise provided by law, cities, counties and other political subdivisions of this state *may regulate only the possession of firearms and ammunition in a public place*, as defined in ORS 161.015." (Emphasis supplied.)

Section IV A(4) of the county ordinance provides that "[n]o person shall possess for purposes of sale an assault weapon in the Exposition Center." The county argues that the ordinance is not in conflict with the state law because, pursuant to ORS 161.015(9), the Exposition Center is a "public place" and, under ORS 166.245, the county is permitted to regulate the possession of firearms in a public place.

The legislature has expressly permitted local enactments only as to possession of firearms in public places. *See City of Portland v. Jackson, supra,* 316 Or at 147 n 2. Contrary to county's position, the legislative history demonstrates that the legislature did not intend that ORS 166.245 would permit regulation of sales of weapons in public places.

ORS 166.245 was the subject of considerable debate and compromise.[12] Its extensive legislative history indicates

---

[11] Or Laws 1989, ch 839.

[12] The initial proposed preemption language would have prohibited *any* regulation by a local government that was not in effect on January 1, 1989, thereby allowing cities with existing regulations to maintain them but prohibiting other local governments from enacting comparable legislation. That amendment was rejected.

that it was supported by both firearms and gun-control advocates. Firearms advocates sought to limit the ability of local governments to regulate firearms beyond the regulations in HB 3470, while gun-control advocates sought to permit some local regulation consistent with existing ordinances. The history indicates that the legislature viewed ORS 166.245 as a "ceiling" above which local governments could not regulate.[13] Above that ceiling was the sale of firearms. During the Senate Judiciary Committee hearings on HB 3470, Senator Shoemaker said:

"Finally, one more point on the Section 38 concerning its effect on swap meets. *Again, I would like to repeat, that section 38 permits local jurisdictions to regulate only the possession of firearms in public places.* Now what that's talking about is carrying arms into public places on your body. That's what its talking about. *Selling falls within section 3, which as I said before, occupies the field.* Permits anyone to sell arms except to certain people. That would

Tape recording, House Judiciary Subcommittee on Natural Resources and Gaming Violations Committee, June 1, 1989, Tape 39, side B at 290. Several comparable versions were subsequently proposed and rejected. Tape recording, House Judiciary Subcommittee on Natural Resources and Gaming Violations Committee, June 1, 1989, Tape 40, side B at 287, and June 5, 1989, Tape 41, side A at 11.

During the full committee hearing, the addition of preemptive language was again discussed. It was assumed that, under existing Oregon case law, preemption was unnecessary. Representative Clark said:

"Preemption language might be helpful in this Bill, it is not necessary in this Bill. Under [*City of Portland v. Dollarhide*, 300 Or 490, 714 P2d 220 (1986)], we have, in fact, preempted what we have preempted and the cities and counties are precluded from moving in those areas by definition and by law, court made law, in the State of Oregon * * *." Tape recording, House Judiciary Committee, June 6, 1989, Tape 45, side A at 256.

Finally, during Joint Ways and Means Committee hearings, the present preemptive language was added as section 38. Representative Burton said that

"a section 38 added to the Bill which is a preemption clause which has been agreed upon by law enforcement and cities and counties which talks about the regulation of possession of firearms in public places.

"* * * * *

"Cities and counties of political subdivisions of this State may regulate possession of firearms and ammunition in public places as defined by ORS 161.015. Effectively, that means that the State law in all other cases is the law that is predominate." Tape recording, Joint Ways and Means Committee, June 22, 1989, Tape 213, side A at 380.

[13] Tape recording, Joint Ways and Means Committee, June 22, 1989, Tape 213, side A at 410.

apply to a swap meet or other such informal sale arrangement." Tape recording, Senate Judiciary Committee, June 29, 1989, Tape 244, side A at 225. (Emphasis supplied.)

We hold that Section IV A(4) exceeds the limits of ORS 166.245 and operates in an area that the legislature intended to preempt. Therefore, that portion of the county ordinance is invalid.

■ Plaintiffs also argue that the court erred in holding that there was no preemption as to the county and city provisions that impose fees. Our inquiry is the same as above. The county ordinance requires a dealer to pay a fee to cover costs of background checks of prospective firearms purchasers. The city's ordinance requires fees for background checks of prospective handgun purchasers. Plaintiffs argue that the imposition of fees is a regulation of the sale of firearms and is preempted by ORS 166.245.

■ ORS 166.245 is silent as to imposition of fees. Unlike the question of the sale of firearms, we do not find in the legislative history an intention that the legislature decided to preempt local legislation of fees. The dissent finds significant that ORS 166.420, which provides for registering the sale of handguns, was enacted as part of HB 3470 that included a section to require a study to be done to determine the cost of background checks. The results of the study were to be presented to the 1991 legislature for consideration, at which time statutory amendments would be considered. The dissent concludes that that study shows the legislative decision to maintain control of fees and to consider the question at a later date.

■ However, seeking information about costs shows only that the legislature wanted reliable figures before deciding whether it should or should not act. It does not show that, while that study was being made, the legislature intended that other governmental bodies could not enact fees. Plaintiffs do not challenge the authority of the city or county to impose compensatory fees. That is what these fees are. The challenged provisions impose fees of $15 for background checks of prospective purchasers of firearms. Neither imposes a sanction for failure to pay the fee nor prevents the sale from being made if the fee is not paid. The provisions do not regulate firearms and are not preempted by state law.

Judgment affirmed as to constitutionality of Multnomah County Ordinance 646, Section IV, and validity of City of Portland Ordinance 163299 and Multnomah County Ordinance Section V; reversed as to validity of Multnomah County Ordinance 646, Section IV(A)(4).

**EDMONDS, J.,** concurring in part; dissenting in part.

Every citizen in this state who owns or anticipates owning a firearm should read the majority's opinion because of its pronouncement about judicial infringement on the constitutional right to bear arms. On this day, the majority holds that the semi-automatic rifles and pistols and certain shotguns listed in Multnomah County Ordinance 646 are not "arms" within the meaning of Article I, section 27, of the Oregon Constitution. Section 27 says:

> "The people shall have the right to bear arms for the defence [*sic*] of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]"

I would hold that the firearms listed in the ordinance are "arms" within the meaning of section 27, but that the ordinance is a reasonable restriction on the right to bear arms. The difference in analysis means much in terms of precedent that will impact the future regulation of semi-automatic firearms on a state-wide basis, whether the regulation occurs in urban or rural areas. For those who are concerned about the "expanding tentacles of government gun control," the majority's holding will give credence to their worst fears. For this author, there is another constitutional principle implicated by the majority's opinion that is equally alarming. The opinion is an example of judicial manipulation of the constitution to meet a perceived localized social need. The majority departs from the fundamental role of interpreting the constitution based on its historical context on behalf of all the citizens of our state and infuses its political orientation into the constitution in the guise of constitutional interpretation. I remind my colleagues that the constitutional line between the legislative and judicial branches of government can be trespassed easily, and we should be circumspect in our adherence to the principle that political decisions are to be made by those who are elected for that purpose. Because of the way in

which the majority analyzes this case, its opinion crosses that line.

On the other issues, I agree with the majority that the portion of section IV (4) of the Multnomah County Ordinance that prohibits a person from possessing an assault weapon in the Exposition Center for purposes of sale is preempted by House Bill 3470. However, I disagree with the majority's holding that there is no preemption of the county and city ordinances that require fees for background checks of prospective firearm purchasers.

The majority and I concur on what the basic test is for an "arm" under section 27. In *State v. Delgado*, 298 Or 395, 400, 692 P2d 610 (1984), the court said:

> "The appropriate inquiry in the case at bar is whether a kind of weapon, as modified by its modern design and function, is of the sort commonly used by individuals for personal defense during either the revolutionary and post-revolutionary era, or in 1859 when Oregon's constitution was adopted. In particular, it must be determined whether the drafters would have intended the word 'arms' to include the switch-blade knife as a weapon commonly used by individuals for self defense." (Footnote omitted.)

At the heart of our differences is the majority's assertion that the listed firearms are different than weapons commonly used for self-defense in 1859. An "arm" under section 27 is not necessarily confined to counterparts of historical weapons, as the majority suggests. The test is more generic because it encompasses technological advances in weaponry. The court said in *Delgado*:

> "The analysis we have employed in *State v. Kessler* [289 Or 359, 614 P2d 94 (1980)] and *State v. Blocker*, [291 Or 255, 630 P2d 824 (1981)] at footnotes 3 and 5, concerning clubs and in this case at bar concerning a knife may not be the same analysis that would be appropriate to the application of Article I, section 27, of the Oregon Constitution to a weapon such as a can of mace, *not having a pre-twentieth century form or counterpart*. It has been suggested that it is incongruous to believe that a woman today to defend herself from a rapist would have constitutional sanction for carrying a switch-blade knife but not for the can of mace because the latter was unknown to the mid-nineteenth century. Such a

case is not before us. The time to deal with that case is when it is presented." 298 Or at 404 n 8. (Emphasis supplied.)

The gravamen of the tests promulgated by the court begins by making a comparison of the weapons in issue with weapons commonly used for self-defense by civilians in 1859. The application of that test means that a contemporary weapon that is the "sort of" weapon used in the mid-nineteenth century may be protected under section 27. For example, the rifle was used for self-defense by civilians and thus is protected; the cannon was not. When a weapon is the "sort of" weapon used for self-defense at that time, the next inquiry is: Would the drafters of section 27 have intended the weapons in issue to be afforded protection, had they been aware of their technological advances?

The evidence is uncontroverted that rifles, shotguns and pistols were in existence in the mid-nineteenth century and were commonly used for personal defense. The listed weapons are the "sort of" weapons commonly used for personal defense in 1859. They are rifles, pistols and shot-guns. The majority ignores their basic nature when it declares that the listed[1] rifles, pistols and shotguns are not

---

[1] The ordinance lists the weapons as:

"(1) All of the following semi-automatic rifles:

Avtomat Kalashnikov (AK), all models,
Beretta AR-70 and BM-59,
Calico M 100 and M 900,
Colt AR-15 and CAR-15,
Daewoo Max-1 and Max-2,
Fabrique Nationale FN-FAL, FN-LAR and FNC,
FAMAS MAS-223,
Galil AR and ARM,
Heckler & Koch HK-91, HK-93, HK-94 an PSG-1,
Sigarms 57 AMT and 500 Series,
Springfield Armory G-3, SAR-48 and BM-59 Alpine,
Sterling MK-6,
Steyr AUG,
Uzi Carbine and Mini Carbine,
Valmet M-76 and M-78

"(2) All of the following semi-automatic pistols:

Calico 100-P,
Encom MK-IV,
Homes MP-83,
Intratec TEC-9,
Iver Johnson Enforcer,
MAC-10 and MAC-11,

"arms" under section 27. Relying on the fact that most of them are semi-automatic firearms,[2] it concludes from a reference to a dictionary that "the technology by which automatic weapons operate precludes a finding that a semi-automatic weapon is a 'counterpart' of a mid-nineteenth century repeating rifle." 122 Or App at 545. It continues its analysis by saying that "while technological advancement does not necessarily mean that a weapon is not 'arms' within Article I, section 27, there is a point at which that advancement renders the constitutional protection inapplicable." 122 Or App at 546. Finally, it supports its assertion with the claim that most of the listed weapons are military weapons or have evolved from military ordinance.[3]

The majority is wrong when it says that at some point, solely technological advancement in the mechanism of a weapon historically used for personal defense renders section 27 protection inapplicable. The Supreme Court said in *Delgado*:

---

Scarab Skorpion,
Sterling MK-7,
Uzi Pistol,
    "(3) All of the following shotguns:
Franchi SPAS-12 and LAW-12,
Striker-12 and Street Sweeper"

[2] Fully automatic firearms fire two or more shots with a single trigger pull. They are considered military weapons. *See State v. Kessler, supra*, 289 Or at 369. Semi-automatic firearms require the trigger to be pulled for each shot fired. Although it is correct that the listed semi-automatic firearms may be illegally modified to become automatic weapons, that is not a reason to deprive them of section 27 protection under the tests adopted by the Supreme Court.

Under the majority's reasoning, a weapon's section 27 status will depend upon whether the manufacture markets the military or civilian version of a weapon first. In the majority's rush to "protect" the public from the use of automatic weapons, they fail to comprehend that even semi-automatic firearms having no military component can be modified to become automatic weapons. Moreover, if the majority is correct that a weapon's evolution is critical to a determination of its protection under section 27, then it further errs by not separately analyzing those listed firearms that did not originate as military weapons.

[3] The majority relies on a quote from *State v. Kessler, supra*; but when the court said that "[t]hese weapons of modern warfare have never been intended for personal possession and protection," it was referring to weapons such as "automatic weapons, explosives, and chemicals of modern warfare." 289 Or at 369. The listed weapons do not fall into any of those categories.

"We are unconvinced by the state's argument that the switch-blade is so 'substantially different from its historical antecedent' (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally. The format and efficiency of weaponry was proceeding apace. This was the period of development of the Gatling gun, breach loading rifles, metallic cartridges and repeating rifles." 298 Or at 403.

The proper test is that, if technological advancement of the weapon in general was within the contemplation of the drafters, and if they would have viewed the weapon as a weapon for personal defense had they been aware of the particular technology in issue, then the technological advancements do not deprive the weapon of section 27 protection.

History teaches us that technological advancement in the mechanism of injecting a cartridge into the firing chamber was occurring in the mid-nineteenth century and the most sought-after characteristic in a firearm was the ability to engage in repetitive firing. In the early nineteenth century, the time required to reload a musket with powder and ball while the enemy was advancing cost many lives. Colt's revolving pistols and rifles were introduced in 1836 and the slide action to inject shells into a chamber was introduced in the late 1830's. By the 1850's, cartridge firearms that allowed repeating firearms to be used for the first time had been introduced. Primitive repeating firearms existed and were available although not commonly possessed, when the Oregon constitution was adopted in 1859.[4] The Henry repeating rifle soon followed and its impact was felt throughout the West. The utility of those firearms was that they enabled the user to fire a weapon rapidly without pausing to reload for significant periods of time. Following the Civil War, such repeating firearms, having proven themselves in combat, were widely used by civilians. In the light of the historical background, it is clear that the framers would have been aware of the effort to continue to develop more efficient ways to inject a cartridge into a firing chamber.

---

[4] An 1858 article about one such firearm, the Volcanic, says that it was "extensively exported to * * * Oregon * * *." *Frank Leslie's Illustrated Newspaper*, October 9, 1858, as quoted in *Evolution of the Winchester*, 1985.

The listed firearms may look like military weapons or may have taken their design from military weapons, but so too did the firearms possessed by militiamen and civilians in the mid-nineteenth century. Historians have said that often civilians were better armed than the Army in the mid-nineteenth century insofar as weapons like rifles were concerned. In *State v. Kessler, supra,* the court said:

> "In the colonial and revolutionary war era, weapons used by militiamen and weapons used in defense of person and home were one and the same. * * *
>
> "Therefore, the term 'arms' as used by drafters of the constitutions probably was intended to include those weapons used by settlers for both personal and military defense. * * *
>
> "The revolutionary war era ended at a time when the rapid social and economic changes of the so-called Industrial Revolution began. The technology of weapons and warfare entered an unprecedented era of change. *Firearms and other hand-carried weapons remained the weapons of personal defense*, but the arrival of steam power, mechanization, and chemical discoveries completely changed the weapons of military warfare." 289 Or at 368. (Citation omitted; emphasis supplied.)

Also, to be afforded protection under the constitution, the weapons must have been commonly used for personal defense in the mid-nineteenth century. This requirement is intended to distinguish weapons like rifles, pistols and shotguns from weapons such as heavy ordnance not kept by militiamen or private citizens. *State v. Kessler,* 289 Or at 369. Again, the evidence is uncontroverted that rifles, shotguns and pistols were kept for personal defense by ordinary citizens in the mid-nineteenth century. The majority's focus is in error when it says:

> "Even if the listed weapons could be said to be the 'equivalent' of mid-nineteenth century repeating arms used for self-defense, such firearms were not in common use at that time." 122 Or App at 549.

The historical predecessors of the listed firearms are not just other repeating firearms but pistols, rifles and shotguns in general which were commonly used by private citizens at that time. It is hard to conceive that the pioneer family facing an attacking foe would have chosen the one shot ball

and powder musket over a firearm that gave them the ability to fire repeatedly. Clearly, had the technological advancements encompassed in the listed semi-automatic firearms been available in 1859, such hand-carried weapons would have been used for personal protection by civilians and would have been given protection under section 27.

The majority's conclusion that the listed semi-automatic rifles, shotguns and pistols are not "arms" within the protection of the section 27 right to bear arms because they are "semi-automatic," will come as a great shock to the many gun owners in Oregon who have possessed semi-automatic rifles and pistols for decades. Taken to its logical extension, that means that the government can make unlawful the possession of a 22 semi-automatic rifle that a 12-year-old child receives as a birthday gift or the semi-automatic pistol that is used by the target shooter. Many inhabitants of our state use semi-automatic weapons for hunting or predator control. As a people, we exult in outdoor recreational pursuits in this state. One need only to look at the number of big game hunting permits issued by the state to understand the significance of those activities to our populace. Although the majority of our citizens live along the I-5 corridor in cities or urban areas, our citizens who live in the rural areas of the state are also entitled to constitutional protection. Removing semi-automatic firearms from the protection of section 27 cuts a wide swath out of a constitutional guarantee that has implications beyond particular urban areas.

The majority is out of step not only with the historical common use of firearms in this state, but with their use by contemporary Oregonians.[5] This court has no authority to

---

[5] Underlying the majority's rationale is the concern about the firepower that is generated by the listed weapons, because of how rapidly they can be fired. Concern about technological advancements in weaponry is not new. In fact, such concerns were being expressed at the time of the adoption of the Oregon Constitution. One author wrote:

"In this age of constant invention and improvement, few branches of manufacturers have received so much attention as that of weapons of destruction. A glance at the list of patents periodically issued convinces one that a greater amount of ingenuity is lavished on the means of curtailing life than on contrivances of an opposite order. In fact, the innovation in destructive weapons appears almost endless." Frank Leslie's Illustrated Newspaper, October 9, 1858, as quoted in McDowell, *Evolution of the Winchester*, page 100 (1985).

However, under the Supreme Court's criteria, the majority's concern is not a reason for abolishing the constitutional right to possess hand-carried firearms.

impose its political will like a quasi-legislature on the citizens of this state. It should interpret the constitution in its historical context and heed the admonishment of the court in *State v. Kessler, supra*, when it said:

"We are not unmindful that there is current controversy over the wisdom of a right to bear arms, and that the original motivations for such a provision might not seem compelling if debated as a new issue. Our task, however, in construing a constitutional provision is to respect the principles given the status of constitutional guarantees and limitations by the drafters; it is not to abandon these principles when this fits the needs of the moment." 289 Or at 362.

However, the fact that the listed firearms are "arms" within the meaning of section 27, does not mean that there is an "unfettered right to possess or use constitutionally protected arms in any way they please." *State v. Delgado, supra*, 298 Or at 403. The constitution requires a liberal interpretation in favor of the citizens, especially as to those provisions designed to safeguard liberty and security in regard to both person and property, *Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 491 (1954). However, as the interest in public safety increases, an individual may have to endure greater burdens on the right to bear arms in certain areas of regulation.

In *State v. Boyce*, 61 Or App 662, 658 P2d 577, *rev den* 295 Or 122 (1983), we articulated a two-part test to determine whether a local regulation restricting the possession of a firearm in a public place is permissible. First, the local government must demonstrate that the unrestricted exercise of the right to possess a firearm is a clear threat to the interests and welfare of the general public. Second, the means chosen by the government must not unreasonably interfere with the right to bear arms for personal defense.

In *Boyce*, we addressed a City of Portland ordinance that made it unlawful for any person to possess a firearm in a public place unless all ammunition had been removed from the chamber and from the cylinder, clip or magazine. In upholding the ordinance as a reasonable restriction on section 27 rights, we said:

"As *Kessler* points out, and as we think obvious, firearms are extraordinarily dangerous. The danger is particularly severe when the firearms are in public places and loaded. Portland

has identified a need to protect its citizens from the hazards that are created when people are permitted to roam free with loaded guns at their sides. The City's assessment was reasonable, and it chose a permissibly limited form of intrusion on the right.

"Section 27 was intended, in part, to enable people to protect their property and themselves. When a threat to person or property arises in the victim's home or other private place, the ordinance will not interfere at all with the victim's defense capacity. It is true, on the other hand, that, when the threat arises in a public place, the fact that a person must have any ammunition separated from his firearm will hinder him to the extent that he is put to the trouble of loading the weapon. However, given the magnitude of the City's felt need to protect the public from an epidemic of random shootings, we think that the hindrance is permissible." 61 Or App at 666.

In *Boyce*, the clear threat to the interest and welfare of the general public was established by two means: first, that firearms are extraordinarily dangerous, which this court considered obvious; and second, that the regulation was designed to protect the public from "an epidemic of random shootings," which the court recognized as a hazard created when people roam the streets with loaded guns.

When the county passed the ordinance, it found, in part:

"H.   Assault weapons are identified as such herein because their design, high rate of fire and capacity to cause injury render them a substantial danger to human life and safety, outweighing any function as a legitimate sports or recreational firearm.

"I.   The proliferation and use of assault weapons pose a present and serious threat to the health, safety and security of the residents of Multnomah County.

"J.   A recent study has shown that while assault weapons account for one million of the estimated 200 million firearms in America, they were used in one of every ten crimes that resulted in a firearms trace last year. The increasing and disproportionate use of assault weapons for criminal purposes endangers both the public and law enforcement personnel.

"K. Recognizing that assault weapons pose a threat to public safety, and with the recommendation from the Bureau of Alcohol, Tobacco and Firearms that assault weapons serve no legitimate sporting or recreational purpose, President Bush stopped the importation of certain assault weapons.

"L. According to the Report and Recommendation of the Bureau of Alcohol, Tobacco and Firearms, dated July 6, 1989, the following characteristics accurately describe assault weapons and distinguish them from traditional sporting rifles: (1) they are semi-automatic versions of machineguns; (2) they have a large magazine capacity; and (3) they have other military features (such as folding/telescoping stocks, well-defined pistol grips, ability to accept bayonet, and flash suppressor).

"M. Law enforcement organizations including the National Sheriffs' Association, the International Association of Chiefs of Police, the National Association of Police Organizations, the Police Executive Research Forum, and the Fraternal Order of Police have called for a national ban on the production and sale of assault weapons." Multnomah County Ordinance 646, § I.

Unless preempted by state law, local governments are permitted to regulate the public possession of firearms in the public interest. ORS 166.245; *State v. Blocker*, 291 Or 255, 630 P2d 824 (1981); *State v. Kessler, supra*, 289 Or at 362 n 4. Moreover, there is no requirement that all firearms be treated alike. However, when arms are regulated, the restrictions must be "reasonable" in the light of the interest that is being addressed by the ordinance and under section 27. By its findings, the county has demonstrated that the listed firearms present a clear threat to the interests and welfare of the general public because of their design, high rate of fire and capacity to cause great injury.

The next step is to determine whether the means chosen by the county unreasonably interferes with the right to bear arms for personal defense. First, the ordinance does not constitute a complete ban on the possession of the listed firearms in public places if the individual complies with the requirements of the ordinance. It requires the firearm to be unloaded, disassembled into its major component parts, locked in a gun case and, if in a vehicle, placed in an inaccessible portion of the vehicle when being transported. However,

those requirements render the firearms effectively useless for personal defense in a public place.

On the other hand, the ordinance does not preclude a citizen's public possession of other firearms not included on the county's list and does not interfere with a citizen's defense capacity in their homes or other private places. *See State v. Blocker, supra,* 291 Or at 259. Moreover, the availability of law enforcement agencies to aid in the defense of citizens in public places impacts the reasonableness of the interference with section 27 rights. In the light of the expressed need to regulate the public possession and the unlawful use of assault weapons in order to protect members of the public, I would hold that the county's decision to restrict a certain class of weapons in public places does not unreasonably burden the right to bear arms under section 27.[6]

The other area of disagreement that I have with the majority is when it concludes that the portion of the county ordinance that requires fees for background checks of "firearm" purchasers and the city ordinance that requires fees for background checks of prospective "handgun" purchasers are not preempted by ORS 166.420. HB 3470 was partially codified in ORS 166.420. It provides:

"(1)     Except as provided in subsection (9) of this section, every person engaged in the business, as defined in 18 U.S.C. [§] 921, of selling, leasing or otherwise transferring a *handgun*, whether the person is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered the time, date and place of sale, the name of the salesperson making the sale, the make, model, manufacturer's number, caliber or other marks of identification on the handgun. The register shall be prepared by and obtained from the State Printer in the form provided in subsection (10) of this section, and shall be furnished by the State Printer to the dealer on application at cost.

---

[6] In *State v. Cartwright,* 246 Or 120, 418 P2d 822 (1966), *cert den* 386 US 937 (1967), the Supreme Court considered whether a statute prohibiting the possession of firearms by a convicted felon infringed on section 27 rights. In that case, the state's interest in protecting the public and preventing convicted felons from possessing firearms was sufficient to proscribe the felon's right to bear arms for personal defense. The court noted that other options were available to the affected individuals for personal defense.

"(2)    The purchaser of any *handgun* shall sign, and the dealer shall require the person to sign, the name of the person and affix the address of the person to the register in triplicate and the salesperson shall affix the signature of the salesperson in triplicate as a witness to the signature of the purchaser. Any person signing a fictitious name or address is guilty of a misdemeanor.

"(3)(a)    The duplicate sheet of the register shall, on the day of sale, be hand delivered or mailed to the local law enforcement authority. If the sale is made in a district where there is no municipal police department, the duplicate sheet shall be hand delivered or mailed first class to the sheriff of the county wherein the sale is made. The duplicate sheets are exempt from disclosure under any public records law. The agency receiving the duplicate sheet shall:

"(A)(i)    Determine, from criminal records and other information available to it, whether the purchaser is disqualified under ORS 166.470 from completing the purchase; and

"(ii)    Notify the dealer when a purchaser is disqualified from completing the purchase. The notification shall be in writing, mailed by certified mail and made within 15 calendar days of the date the duplicate was mailed by the dealer.

"(B)    Retain the duplicate sheets for no more than five years at which time the sheets shall be destroyed.

"(b)    The triplicate sheet of the register shall be mailed on the day of sale to the Department of State Police. The Department of State Police shall conduct a criminal records check of the purchaser using the thumbprints on the triplicate and shall send, within 10 calendar days of the date the triplicate was mailed by the dealer, the triplicate with the results of the records check to the agency that received the duplicate. If the thumbprints are illegible, the Department of State Police, by mail, shall immediately notify the dealer of that fact." (Emphasis supplied.)

Section 29(4)[7] of HB 3470 required a one year study be done to determine the cost of background checks. For the

---

[7] Section 29 provides:

"The Department of State Police shall conduct a study concerning the sale of firearms. The study shall be one year in duration and be completed no later than January 1, 1991. During the study period:

"(1)    All persons engaged in the business of selling, as defined in 18 U.S.C. [§] 921, leasing or otherwise transferring a rifle, shotgun or other long gun,

study, background checks were required for both the purchase of handguns and long-barreled guns. Currently, background checks are required only for handguns. The results of the study were to be presented to the 1991 legislature for consideration, at which time statutory amendments would be

whether the person is a retail dealer, pawnbroker or otherwise, shall keep a register to record the sale of rifles, shotguns and other long guns:

"(a)    The register used shall be the same as is used to record the sale of a handgun under ORS 166.420 except that the thumbprints and manufacturer's serial number shall not be required. The dealer shall fill out the register and mail the duplicate and triplicate sheets as provided in ORS 166.420.

"(b)    *The person receiving the duplicate shall conduct a background check as if the purchaser were purchasing a handgun. If the background check shows that the purchaser would be prohibited from possessing or owning the firearm under [ORS] 166.250, the person conducting the background check shall send that information to the Department of State Police.*

"(c)    Except for completing the register as required in this subsection, *the study shall in no way alter the manner in which rifles, shotguns and other long guns are sold.*

"(2)    Local law enforcement agencies shall notify the Department of State Police whenever a person is disqualified from purchasing a handgun under ORS 166.420. The notification shall include the basis for the disqualification. If the person is arrested, charged or convicted of violating section 15 of this Act as a result of the attempted purchase, that information shall also be transmitted to the Department of State Police.

"(3)    Unless otherwise requested by the purchaser of a rifle, shotgun or other long gun, it is unlawful for local law enforcement agencies to maintain a registry containing the information submitted to them as part of the study required by this section.

"(4)    The Department of State Police shall:

"(a)    Use the triplicate sheets submitted to it under ORS 166.420(3) and subsection (1) of this section to record the total number of sales of handguns and rifles, shotguns and long guns.

"(b)    Notwithstanding ORS 166.420(3)(c), compile and maintain the information submitted under this section.

"(c)    Submit to the Sixty-sixth Legislative Assembly a report consisting of:

"(A)(i)    The total number of rifles, shotguns and other long guns sold during the period of the study;

"(ii)    The total number of purchasers who were prohibited from possessing or owning the rifle, shotgun or other long gun under ORS 166.250;

"(iii)    A breakdown of the bases for the prohibition;

"(iv)    The total number of persons arrested, charged or convicted of violating ORS 166.250; and

"(v)    The total cost in both dollars and work-hours of completing the background investigations and bringing into custody those persons believed to have violated ORS 166.250.

"(B)(i)    The total number of applications for the purchase of handguns;

considered. The legislature's decision to elicit information concerning the cost of background checks indicates that it intended to occupy the area of regulation of background checks and any fees connected therewith. The majority says

> "seeking information about costs shows only that the legislature wanted reliable figures before deciding whether it should or should not act. It does not show that while the study was being made the legislature intended that other governmental bodies could not enact fees." 122 Or App at 552.

That assertion ignores the fact that the legislation was intended as a compromise by the various interest groups to preclude regulation by local governments. Preemption of a local government ordinance by a state statute occurs when an ordinance regulates an area that the legislature has expressly decided to regulate either by an express legislative decision, by a decision apparent in the legislative history or otherwise and the laws are in conflict. *City of Portland v. Jackson*, 316 Or 143, 151, 850 P2d 1093 (1993). Because the history of House Bill 3470 unequivocally shows that the legislature intended to control the subject of background checks and fees, I would hold that the county and city ordinances are preempted in that regard.

For these reasons, I dissent.

Warren, J., joins in this concurring and dissenting opinion.

---

"(ii)    The total number of applicants who were disqualified from purchasing a handgun;

"(iii)    A breakdown of the bases for disqualification;

"(iv)    The total number of persons arrested, charged or convicted of a violation of section 15 of this Act; and

"(v)    The total cost in both dollars and work-hours for completing the background investigations and bringing into custody the persons believed to have violated section 15 of this Act." (Emphasis supplied.)