Submitted March 23, resubmitted en banc December 6, 2011, affirmed March 21, petition for review allowed October 4, 2012 (352 Or 564)

**STATE OF OREGON**
and City of Portland,
*Plaintiffs-Respondents,*

*v.*

**JONATHAN D. CHRISTIAN,**
aka Jonathan David Christian,
*Defendant-Appellant.*

Multnomah County Circuit Court
080951814; A142137

274 P3d 262

Peter Gartlan, Chief Defender, and Neil F. Byl, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Erika L. Hadlock, Senior

Assistant Attorney General, filed the brief for respondent State of Oregon.

Harry Auerbach, Chief Deputy City Attorney, City Attorney's Office, filed the brief for respondent City of Portland.

Before Brewer, Chief Judge, and Haselton, Armstrong, Wollheim, Schuman, Ortega, Sercombe, and Nakamoto, Judges, and Edmonds, Senior Judge.

SCHUMAN, J.

Armstrong, J., dissenting

Edmonds, S. J., dissenting.

## SCHUMAN, P. J.

Defendant was charged with two counts of violating a state law against carrying a concealed firearm, one count of violating a state law against carrying a concealed knife, and two counts of violating a Portland ordinance against carrying a firearm in a public place having recklessly failed to unload it. Before trial, he filed a "demurrer/motion to dismiss," arguing that the concealed firearm statute and the Portland ordinance violate the Second Amendment to the United States Constitution and Article I, section 27, of the Oregon Constitution. The court denied the demurrer and motion, and defendant was subsequently convicted on all charges. On appeal, he assigns error to the denial of his demurrer and motion, but only insofar as the ruling rejected his challenges to the Portland ordinance; he does not challenge the state laws or appeal his other convictions. We conclude that the ordinance is constitutional. We therefore affirm.

### INTERPRETATION OF PCC 14A.60.010(A)

By virtue of his demurrer and pretrial motion to dismiss, defendant chose to challenge the ordinance facially, that is, by contending that enactment of the ordinance violates the Oregon and United States constitutions regardless of the circumstances in which it was enforced or applied against him. *See State v. Borowski*, 231 Or App 511, 516, 220 P3d 100 (2009) (describing facial challenges). Two consequences flow from that choice. First, the only relevant facts in this case are that defendant was charged with, and tried for, violating the ordinance, and those facts are relevant only to establish that he has standing to challenge it; the circumstances surrounding his arrest play no part in our analysis. *Id.* Second, although generally a facial challenge to a law will fail if the law can constitutionally be applied in any imaginable situation, *Jensen v. Whitlow*, 334 Or 412, 421, 51 P3d 599 (2002), in a facial challenge under Article I, section 27, a starkly different analysis applies: If we determine that legislation is significantly overbroad—that, in some significant number of circumstances, it punishes constitutionally protected activity—we must declare the legislation to be unconstitutional, *State v. Hirsch/Friend*, 338 Or 622, 626-29, 114 P3d 1104 (2005)—although it is also important to note that "a

statute that proscribes protected conduct only at its margins remains valid." *State v. Illig-Renn*, 341 Or 228, 232, 142 P3d 62 (2006); *see also New York v. Ferber*, 458 US 747, 773, 102 S Ct 3348, 73 L Ed 2d 1113 (1982) (upholding, against a facial challenge, a statute "whose legitimate reach dwarfs its arguably impermissible applications").[1]

The ordinance at issue, Portland City Code (PCC)14A.60.010(A),[2] provides:

> "It is unlawful for any person to knowingly possess or carry a firearm, in or upon a public place, including while in a vehicle in a public place, recklessly having failed to remove all the ammunition from the firearm."

There are 14 exceptions that "constitute affirmative defenses to a violation" of the ordinance, including for police and military personnel, persons with a concealed handgun permit, and hunters while hunting or going to or returning from a hunting expedition. PCC 14A.60.010(C).[3]

---

[1] It is also worth noting that this "overbreadth" rule derives from United States Supreme Court cases under the First Amendment, *State v. Blocker*, 291 Or 255, 261, 630 P2d 824 (1981), and is, in federal law, limited to such cases, *Broadrick v. Oklahoma*, 413 US 601, 611, 93 S Ct 2908, 37 L Ed 2d 830 (1973). As the Fourth Circuit has explained, overbreadth analysis addresses a "speech-specific problem, [*Broadrick*] at 611-12. * * * [O]verbroad regulations [of expression] can easily encourage speakers to modify their speech, shifting it away from controversy. *No analogous arguments obtain in the Second Amendment context.*" *U.S. v. Chester*, 628 F3d 673, 688 (4th Cir 2010) (emphasis added). Nonetheless, the Oregon Supreme Court in *Blocker*, 291 Or at 261, applied First Amendment overbreadth in the context of Article I, section 27, without explaining why the doctrine should apply outside of free expression or assembly cases, and *Blocker* was cited as authority in *Hirsch/Friend*, 338 Or at 626-29—again without explanation or analysis.

[2] Portland has statutory authority to enact regulations of firearms. ORS 166.173(1).

[3] "The following are exceptions and constitute affirmative defenses to a violation of [the ordinance]:

"1. A police officer or other duly appointed peace officers, whether active or honorably retired.

"2. A member of the military in the performance of official duty.

"3. A person licensed to carry a concealed handgun.

"4. A person authorized to possess a loaded firearm while in or on a public building under ORS 166.370.

"5. A government employee authorized or required by his or her employment or office to carry firearms.

"6. A person summoned by a police officer to assist in making arrests or preserving the peace, while such person is actually engaged in assisting the officer.

Most of the words and phrases in PCC 14A.60.010(A) have noncontroversial plain meanings: possess, carry, vehicle, remove, ammunition. "Public place" is defined elsewhere in the code (PCC 14A.10.010(O)) and is not controversial for purposes of this challenge. "Knowingly" and "recklessly" are not expressly defined in the code; however, PCC 14A.20.040 provides that the code "shall be construed so as to render it consistent with state criminal law," and state criminal law—in particular, ORS 161.085—defines the terms as follows:

"(8) 'Knowingly' or 'with knowledge,' when used with respect to conduct or to a circumstance described by a statute defining an offense, means that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists.

"(9) 'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

A violation of the ordinance occurs, then, when a person (1) possesses or carries a loaded firearm in a public place;

---

"7. A merchant who possesses or is engaged in lawfully transporting unloaded firearms as merchandise.

"8. Organizations which are by law authorized to purchase or receive weapons from the United States or from this state.

"9. Duly authorized military or civil organizations while parading, or their members when going to and from the places of meeting of their organization.

"10. A corrections officer while transporting or accompanying an individual convicted of or arrested for an offense and confined in a place of incarceration or detention while outside the confines of the place of incarceration or detention.

"11. Persons travelling to and from an established target range, whether public or private, for the purpose of practicing shooting targets at the target ranges.

"12. Licensed hunters or fishermen while engaged in hunting or fishing, or while going to or returning from a hunting or fishing expedition.

"13. A person authorized by permit of the Chief of Police to possess a loaded firearm, clip or magazine in a public place in the City of Portland.

"14. A security guard employed at a financial institution insured by the Federal Deposit Insurance Corporation while the security guard is on duty."

(2) *knows* that he or she is carrying or possessing the loaded firearm and that the place is public; (3) *recklessly* does so anyway, that is, is aware of the fact that carrying the loaded firearm in public creates an unreasonable, unjustifiable risk; and (4) nonetheless consciously disregards that risk and bears the firearm in a public place anyway.

Defendant (and the dissent) under-appreciate the effect of the term "recklessly," apparently contending that it refers only to the isolated act of not unloading the firearm, as opposed to that act and its inherent consequent risks when the loaded weapon is borne in public. That interpretation makes no sense logically or syntactically. It would result in a rule that prohibits carrying a loaded firearm in public, having at some point been aware of and consciously disregarding the risk that not unloading the firearm creates a significant, unreasonable, and unjustifiable risk of . . . a loaded firearm. To take an action recklessly—that is, aware of and disregarding the fact that the action creates a risk—the risk must be of something other than the action itself. We do not say that a person who drives recklessly does so because he or she drives while aware of and disregarding the risk that he or she will drive. The crime of reckless driving is made out only if the driving "endangers the safety of persons or property." ORS 811.140(1).

"Recklessly," however, itself incorporates another undefined term: "unjustifiable risk." Defining that term is crucial, because consciously disregarding a *justifiable* risk is not *reckless* and is therefore not prohibited by the ordinance. Because the term "unjustifiable risk" is defined in the criminal code, ORS 161.085(9), the code's related provisions in the same chapter and regarding "justification," ORS 161.190 to 161.275, are relevant and instructive. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). Of particular relevance to PCC 14A.60.010(A) are provisions governing the use of "deadly physical force," because the risk of misusing loaded firearms is presumptively deadly. A person is justified in using deadly physical force against another person if the user reasonably believes that the other person is

"(1) Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or

"(2) Committing or attempting to commit a burglary in a dwelling; or

"(3) Using or about to use unlawful deadly physical force against a person."

ORS 161.219. Further, a person is justified in using deadly physical force in defense of premises "[w]hen the person reasonably believes it necessary to prevent the commission [by a trespasser] of arson or a felony by force and violence * * *." ORS 161.225(2)(b).

Thus, adopting the meaning of "unjustified" into the definition of "recklessly" and the definition of "recklessly" into PCC 14A.60.010(A), we come to the following interpretation of that provision: A violation of the ordinance occurs if (1) a person possesses or carries a loaded firearm in a public place; (2) the person knows that he or she is carrying the firearm, that it is loaded, and that he or she is in a public place; (3) the person is conscious that being in a public place with the loaded firearm creates a substantial risk; (4) the substantial risk is unjustified, that is, it is not a risk that would inhere in using the firearm for the kinds of self-defense, defense of others, or defense of premises that are statutorily justified; and (5) the person nonetheless disregarded that risk.[4]

## PCC 14A.60.010(A) AND ARTICLE I, SECTION 27

Article I, section 27, of the Oregon Constitution provides:

---

[4] ORS 161.115(3) provides, "When recklessness suffices to establish a culpable mental state, it is also established if a person acts intentionally or knowingly." Thus, "intentionally" and "knowingly" incorporate the elements of recklessness, including the element of unjustifiable risk. *State v. Cook*, 163 Or App 578, 582, 989 P2d 474 (1999) ("By statutory definition, however, 'reckless' is subsumed within 'intentional' as a mental element actuating criminal conduct."). As applied to PCC 14A.60.010(A), ORS 161.115(3) means that a violation of the ordinance is established if a person intentionally or knowingly creates an unjustified risk that harm will occur.

"The people shall have the right to bear arms for the defence [*sic*] of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]"

Does PCC 14A.60.010(A), as interpreted above, interfere with a person's right to bear arms in defense of self or home? *See State v. Kessler*, 289 Or 359, 367, 614 P2d 94 (1980) (Article I, section 27, protects individual right to protect self *or home*). The history and scope of Article I, section 27, have been thoroughly and authoritatively discussed and reviewed by the Supreme Court, most recently in *Hirsch/Friend*, 338 Or at 632-78. We see no benefit in rehearsing that work here beyond restating its relevant conclusions:

"[W]hen the drafters of the Oregon Constitution adopted and approved the wording of Article I, section 27, they did not intend to deprive the legislature of the authority to restrict arms possession (and manner of possession) to the extent that such regulation of arms is necessary to protect the public safety. * * *

"That is not to say, however, that the legislature's authority to restrict the bearing of arms is so broad as to be unlimited. Rather, any restriction must satisfy the purpose of that authority in the face of Article I, section 27: the protection of public safety. It follows that, although it has broad authority under that provision to assess the threat to public safety that a particular group poses, the legislature is not free to designate any group without limitation as one whose membership may not bear arms. Instead, such a designation must satisfy the permissible legislative purpose of protecting the security of the community against the potential harm that results from the possession of arms.

"The foregoing conclusion is consistent with the historical underpinnings of the right to bear arms * * *. It also is consistent with the early American arms restrictions and certain early practices * * * of disarming particular persons who threatened the state's interest in maintaining security: The common thread among all those restrictions was their objective of protecting the public from identifiable threats to the public safety, such as serious criminal conduct and various harms resulting from the possession of arms (*e.g.*, shooting within town limits)."

*Id.* at 677-78. In light of these precepts, the answer to the question raised above—Does PCC 14A.60.010(A) interfere with a person's constitutional right to bear arms in defense of self or home?—seems self-evident. The ordinance does not prohibit a person from *any* conduct in home, even reckless conduct and intentional misconduct short of crime. It does not prohibit a person with a permit to carry concealed weapons from knowingly carrying a recklessly not-unloaded firearm in a public place. PCC 14A.60.010(C)(3) (exception for person licensed to carry a concealed handgun). It does not prohibit a person from carrying a recklessly not-unloaded weapon in a public place in order to engage in justified conduct—reasonable defense of self against felonious attack. Its prohibitory scope includes only a person who has knowingly carried a loaded firearm in a public place for some purpose other than defense of self or home from felonious attack, consciously disregarding the substantial risk that doing so will endanger public safety. Compared to the lawful sweep of the ordinance, such occurrences—if there are any—are rare outliers; thus, even if such occurrences were constitutionally protected, the statute would survive a facial challenge. *Illig-Renn*, 341 Or at 232 (statute that proscribes protected conduct only at its margins remains valid).

More to the point, the rare instances of conduct that the ordinance prohibits are *not* protected; rather, they are well within the city's legislative authority as necessary to protect public safety, as that concept was understood when the Oregon Constitution was adopted and as it is understood today. As thoroughly explained by the dissent and by the court in *Hirsch/Friend*, statutes and ordinances regulating the possession of concealed weapons and completely banning the discharge of firearms in urban areas were commonplace and well accepted when the Oregon Constitution was adopted. Using such statutes as guidelines for determining the scope of Article I, section 27, today, the court in *Hirsch/Friend* concluded that statutes prohibiting the possession of firearms by felons pass muster under the Oregon Constitution. 338 Or at 678. In reaching that conclusion, the court in *Hirsch/Friend* reasoned that, although lawmakers had authority to restrict the right to bear arms in defense of self,

that authority is not unlimited. *Id.* at 677. But the limiting principle is this: "[A]ny restriction must satisfy the purpose of that authority in the face of Article I, section 27: the protection of public safety, * * * [that is,] protecting the security of the community against the potential harm that results from the possession of arms." *Id.* at 677-78. A narrowly drawn ordinance that penalizes a person only if he or she consciously disregards a substantial risk that failing to unload a weapon that he or she will carry or has carried into a public place for some *unjustified* purpose will cause substantial harm—such an ordinance trenches on no conduct that is protected by the right to bear arms as that right is guaranteed by Article I, section 27, as definitively construed.[5]

## PCC 14A.60.010(A) AND THE SECOND AMENDMENT

The Second Amendment provides:

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

The protections afforded by the Second Amendment are incorporated into the Fourteenth Amendment and therefore apply against state and local governments. *McDonald v. Chicago,* ___ US ___ , ___ , 130 S Ct 3020, 177 L Ed 2d 894 (2010).

It is axiomatic that a law that is not proscribed by the Oregon Constitution may nonetheless violate the United States Constitution in the event that the federal guarantee affords more protection than the state guarantee. Unlike the challenge under the Oregon Constitution, however, defendant's challenge under the Second Amendment can be disposed of with little difficulty. That is so because the standard for evaluating a facial overbreadth challenge under the Second Amendment is different from the standard under Article I, section 27. As noted above, 249 Or App at 4 n 1,

---

[5] Although neither party advances an interpretation of PCC 14A.60.010(A) that is precisely the same as the one that we arrive at, the city does argue that the term "unjustified" limits application of the ordinance to rare circumstances. In any event, this court is obligated to correctly interpret laws even if the parties do not. *Stull v. Hoke,* 326 Or 72, 77, 948 P2d 722 (1997).

under Article I, section 27, so-called "First Amendment over-breadth" analysis applies so that an enactment will be declared unconstitutional on its face if it is significantly over-broad, that is, if it would violate the constitution in any significant number of applications. *Hirsch/Friend*, 338 Or at 628-29. Under federal constitutional law, however, First Amendment overbreadth applies only to First Amendment cases; in Second Amendment cases, as in all other facial constitutional challenges outside of the First Amendment, the enactment will be declared unconstitutional only if it is unconstitutional in *every* conceivable application. *United States v. Salerno*, 481 US 739, 745, 107 S Ct 2095, 95 L Ed 2d 697 (1987); *see also Ohio v. Akron Center for Reproductive Health*, 497 US 502, 514, 110 S Ct 2972, 111 L Ed 2d 405 (1990) ("[B]ecause appellees are making a facial challenge to a statute, they must show that *no set of circumstances exists* under which the Act would be valid." (Internal quotation marks omitted; emphasis added.)); *U.S. v. Chester*, 628 F3d 673, 688 (4th Cir 2010) (First Amendment overbreadth does not apply in Second Amendment cases). Because we have established that the ordinance is constitutional in almost every situation, it follows *a fortiori* that it is constitutional in some situations. At the least, it could for example be applied constitutionally to a person who carries a recklessly not-unloaded firearm into a courtroom or school. *District of Columbia v. Heller*, 554 US 570, 626, 128 S Ct 2783, 171 L Ed 2d 637 (2008). PCC 14A.60.010(A) does not, on its face, violate the Second Amendment.

## DISPOSITION

Defendant was convicted of violating several state statutes in addition to PCC 14A.60.010. He does not appeal the state law convictions, and we therefore affirm them. Regarding the Portland ordinance, defendant assigns error to the trial court's denial of his demurrer and to his motion to dismiss. The demurrer and motion to dismiss were submitted before trial in a single document and supported by only one argument: that PCC 14A.60.010(A) is facially unconstitutional.[6] Because we conclude that the trial court did not err in

---

[6] Defendant characterized the motion to dismiss as a motion "pursuant to ORS 135.630(4), on the grounds that because the applicable statute is unconstitutional,

rejecting that argument, we must affirm defendant's conviction under the ordinance, without necessarily agreeing that the facts as adduced at trial justify that verdict.

Affirmed.

**ARMSTRONG, J.,** dissenting.

The majority tries but fails to identify a plausible interpretation of the Portland ordinance that differs from the one that Judge Edmonds has identified in his dissent. Stated simply, and subject to exceptions that are not relevant to this case, the ordinance prohibits a person from knowingly carrying a firearm in a public place in Portland that the person has recklessly failed to unload. In context, the reference to a reckless failure to unload the firearm describes circumstances in which the person "is aware of and consciously disregards a substantial and unjustifiable risk" that the firearm is loaded. In other words, the person carries the firearm notwithstanding a substantial risk that it is loaded and under circumstances in which the person's contrary belief is unjustified. So understood, the ordinance distinguishes between a gang member who carries a gun that another gang member has asked the person to carry to patrol the gang's purported territory and a person who carries a gun to a shooting range that the person's parent has said is unloaded. It is evident that the city sought to draw such a distinction in enacting its ordinance. The majority's effort to construct a different understanding of the ordinance is understandable but unavailing.

So understood, I have no difficulty concluding that the ordinance violates Article I, section 27, of the Oregon Constitution, which guarantees to people the right to bear arms for personal defense.[1] Judge Edmonds has produced a

the facts stated do not constitute an offense[.]" ORS 135.630(4) provides that a "defendant may demur to the accusatory instrument when it appears *upon the face thereof* * * * [t]hat the facts stated do not constitute an offense." (Emphasis added.) Thus, the assertion that the facts stated do not constitute an offense refers to the facts alleged in the information, not the facts developed at trial.

[1] Article I, section 27, of the Oregon Constitution provides:

"The people shall have the right to bear arms for the defence [*sic*] of themselves and the State, but the Military shall be kept in strict subordination to the civil power[.]"

comprehensive analysis of the history behind the adoption of Oregon's constitutional guarantee of the right to bear arms. In light of that history, I have no doubt that a restriction that prohibits most people from openly carrying a loaded firearm in all places open to the public, as Portland's ordinance does, violates the Oregon guarantee. I also have no doubt that there are restrictions on the manner and locations in which people can carry loaded firearms that the state and local governments may impose without violating the Oregon guarantee. Our task in this case, however, is not to identify permissible governmental restrictions on the carrying of loaded firearms in public but to determine whether the Portland ordinance violates the Oregon guarantee. I am satisfied that it does, and I therefore dissent from the majority's contrary conclusion.

Brewer, C. J., Nakamoto, J., and Edmonds, S. J., join in this dissent.

**EDMONDS, S. J.,** dissenting.

The majority holds that Portland City Code (PCC) 14A.60.010 is constitutional under Article I, section 27, of the Oregon Constitution. I disagree with the majority's holding because (1) the majority's interpretation is at odds with the interpretation advanced by the city; (2) the majority's interpretation is at odds with the rule of construction that legislative enactments are to be construed to express the intention of their drafters; (3) the majority's interpretation fails to inform an ordinary person what the circumstances are that will result in the person being in violation of the ordinance; and (4) the reach of the ordinance infringes on the right to self-defense guaranteed by Article I, section 27, because it prohibits the possession or carrying of a loaded firearm openly in *all* public places within the city. In sum, the majority's interpretation creates different elements for conviction under the ordinance than the parties understood at the time of trial of this case, and, as a result, defendant finds himself convicted of a crime that he did not commit.

PCC 14A.60.010 is entitled "Possession of a Loaded Firearm in a Public Place." Subsections (A) and (B) of PCC 14A.60.010 provide:

"A.   It is unlawful for any person to knowingly possess or carry a firearm, in or upon a public place, including while in a vehicle in a public place, recklessly having failed to remove all the ammunition from the firearm.

"B.   It is unlawful for any person to knowingly possess or carry a firearm and that firearm's clip or magazine, in or upon a public place, including while in a vehicle in a public place, recklessly having failed to remove all the ammunition from the clip or magazine."[1]

---

[1] ORS 166.173 provides:

"(1) A city or county may adopt ordinances to regulate, restrict or prohibit the possession of loaded firearms in public places as defined in ORS 161.015.

"(2) Ordinances adopted under subsection (1) of this section do not apply to or affect:

"(a) A law enforcement officer in the performance of official duty.

"(b) A member of the military in the performance of official duty.

"(c) A person licensed to carry a concealed handgun.

"(d) A person authorized to possess a loaded firearm while in or on a public building or court facility under ORS 166.370.

"(e) An employee of the United States Department of Agriculture, acting within the scope of employment, who possesses a loaded firearm in the course of the lawful taking of wildlife."

PCC 14A.60.010(C) specifically provides for exceptions to the prohibition on the possession of a loaded firearm in public:

"The following are exceptions and constitute affirmative defenses to a violation of the ordinance:

"1. A police officer or other duly appointed peace officers, whether active or honorably retired.

"2. A member of the military in the performance of official duty.

"3. A person licensed to carry a concealed handgun.

"4. A person authorized to possess a loaded firearm while in or on a public building under ORS 166.370.

"5. A government employee authorized or required by his or her employment or office to carry firearms.

"6. A person summoned by a police officer to assist in making arrests or preserving the peace, while such person is actually engaged in assisting the officer.

"7. A merchant who possesses or is engaged in lawfully transporting unloaded firearms as merchandise.

"8. Organizations which are by law authorized to purchase or receive weapons from the United States or from this state.

"9. Duly authorized military or civil organizations while parading, or their members when going to and from the places of meeting of their organization.

"10. A corrections officer while transporting or accompanying an individual convicted of or arrested for an offense and confined in a place of incarceration

PCC 14A.10.010(O) defines a "public place" as a

> "publicly or privately owned place to which the general public has access and may include but is not limited to public property and areas of private property open to the public such as spaces within apartment houses and hotels not constituting rooms or apartments designed for actual residence, schools, places of amusement, parks, playgrounds, and premises used in connection with public passenger transportation."

Article I, section 27, provides that "the people shall have the right to bear arms for the defence [*sic*] of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]"[2] Defendant argues that PCC 14A.60.010(A) is constitutionally overbroad under Article I, section 27, because the ordinance "prohibit[s] the public from possessing loaded firearms in public places." In defendant's view, the ordinance "defeats the purpose" of Article I, section 27, because "[a] firearm cannot be used for self-defense unless it is loaded."

Some background is helpful to understand the issue framed by defendant's challenge to the constitutionality of the ordinance. In *State v. Boyce*, 61 Or App 662, 658 P2d 577, *rev den*, 295 Or 122 (1983), this court rejected an overbreadth challenge to *former* PCC 14.32.010, reasoning that the city's restriction against carrying loaded firearms within its boundaries did not violate Article I, section 27. *Id*. at 666. The city's initial response to defendant's argument is to rely on our

---

or detention while outside the confines of the place of incarceration or detention.

"11. Persons travelling to and from an established target range, whether public or private, for the purpose of practicing shooting targets at the target ranges.

"12. Licensed hunters or fishermen while engaged in hunting or fishing, or while going to or returning from a hunting or fishing expedition.

"13. A person authorized by permit of the Chief of Police to possess a loaded firearm, clip or magazine in a public place in the City of Portland.

"14. A security guard employed at a financial institution insured by the Federal Deposit Insurance Corporation while the security guard is on duty."

[2] In contrast to Article I, section 27, the Second Amendment to the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

holding in *Boyce*. It contends that we ought to hold the ordinance constitutional under *Boyce* because "[t]he only difference between [*former* PCC 14.32.010] and PCC 14A.60.010, under which defendant here was convicted, is that the latter now includes a *mens rea* requirement, that the failure to remove the ammunition be 'reckless.' "

In my view, this court's reasoning in *Boyce* has been implicitly overruled by the Supreme Court's holding in *State v. Hirsch/Friend*, 338 Or 622, 114 P3d 1104 (2005). In *Hirsch/Friend*, the court adopted a standard of review with respect to Article I, section 27, that it had previously applied to challenges involving Article I, section 8, of the Oregon Constitution.[3] The court explained that,

> "[u]nlike with other facial challenges, a challenger raising an overbreadth challenge need not demonstrate that the statute at issue is unconstitutional under the particular circumstances at hand. Rather, the challenger will prevail in his or her facial challenge if the court concludes that the statute in question prohibits constitutionally protected conduct of any kind."

338 Or at 628. Consequently, we are to determine in this case whether, in light of the express guarantee in Article I, section 27, to bear arms for purposes of self-defense, the city's ordinance prohibits constitutionally protected conduct of *any* kind.

In *Boyce*, we undertook to answer that question as it applied to an earlier version of the city's ordinance. We held that ordinance to be constitutionally valid as an exercise of the City of Portland's police power. Relying on *Christian et al. v. La Forge*, 194 Or 450, 242 P2d 797 (1952), we explained:

> "In fulfilling its obligation to protect the health, safety and welfare of its citizens, a government body must sometimes pass legislation that touches upon a right guaranteed by the state or federal constitution. Such an encroachment is permissible when the unrestricted exercise of the right poses a clear threat to the 'interests and welfare of the public in general.' "

---

[3] Article I, section 8, guarantees the right to "free expression of opinion" and "the right to speak, write, or print freely on any subject whatever."

*Boyce*, 61 Or App at 665-66 (quoting *Christian*, 194 Or at 462). However, the Supreme Court's subsequent decisions in *Hirsch / Friend* and *State v. Delgado*, 298 Or 395, 692 P2d 610 (1984), cast doubt on the holding in *Boyce*.

Again, some case law background is helpful to understanding the court's holding in *Hirsch / Friend*. In *State v. Kessler*, 289 Or 359, 614 P2d 94 (1980), the Supreme Court considered the scope of Article I, section 27, for the first time. *Delgado*, 298 Or at 398. In *Kessler*, the defendant was charged with possession of billy clubs in violation of a state statute. When *Kessler* came before the Court of Appeals, this court held that the prohibition in the statute was within the reasonable exercise of the state's "police power" to control crime. *State v. Kessler*, 43 Or App 303, 307, 602 P2d 1096 (1979). The Supreme Court reversed our holding in *Kessler* after examining the historical roots of Article I, section 27.[4]

Following *Kessler*, the court, in *Delgado*, undertook to decide whether a state statute prohibiting the mere possession and carrying of a switchblade knife violated the defendant's right to bear arms under Article I, section 27. The court did not frame the issue in terms of a reasonable exercise of governmental power to regulate for purposes of public safety. Rather, it stated:

> "The appropriate inquiry in the case at bar is whether a kind of weapon, as modified by its modern design and function, is of the sort commonly used by individuals for personal defense during either the revolutionary and post-revolutionary era, or in 1859 when Oregon's constitution was adopted. In particular, it must be determined whether the drafters would have intended the word 'arms' to include the switch-blade knife as a weapon commonly used by individuals for self defense."

*Delgado*, 298 Or at 400-01 (footnote omitted).

In *Hirsch / Friend*, the court explained more fully why it refused to consider the power of a governmental entity

---

[4] The court held in *State v. Blocker*, 291 Or 255, 259, 630 P2d 824 (1981), that the possession of a billy club outside as well as inside a residence is constitutionally protected under Article I, section 27.

to regulate for purposes of public safety in determining an issue of constitutionality under Article I, section 27:

> "As noted, in both [*State v. Robinson*, 217 Or 612, 343 P3d 886 (1959),] and [*State v. Cartwright*, 246 Or 120, 418 P2d 822 (1966), *cert den*, 386 US 937 (1967)], this court grounded its conclusions that the statutory prohibition at issue did not contravene Article I, section 27, in the 'police power' doctrine, which generally seeks to determine whether a legislative enactment reasonably 'is in the interests of the public health, safety, and general welfare.' *Christian et al. v. La Forge*, 194 Or 450, 462, 242 P2d 797 (1952). However, this court in more recent years has explained that any constitutional notion of the 'police power' does not refer to an independent source of legislative power itself; rather, it merely represents the legislature's general plenary power to legislate. * * * [S]ee also Eckles v. State of Oregon*, 306 Or 380, 399, 760 P2d 846 (1988), *cert dismissed*, 490 US 1032 (1989) ('[T]he "police power" is indistinguishable from the state's inherent power to enact laws and regulations; the existence of that power cannot explain the extent to which the power is constitutionally limited.'). The court similarly has clarified that 'the state cannot avoid a constitutional command by "balancing" it against another of the state's interests or obligations, such as protection of the "vital interests" of the people'; *rather, any constitutional limitations on the state's actions 'must be found within the language or history' of the constitution itself. Eckles*, 306 Or at 399."

338 Or at 638-39 (citation omitted; emphasis added).

In keeping with the above construct, the *Hirsch/Friend* court observed:

> "The court in *Kessler* first discussed the origins of Article I, section 27, noting that it shared a common historical background with other state constitutional arms provisions drafted in the Revolutionary and post-Revolutionary War era. [289 Or] at 363. In the court's view, that common background suggested three likely purposes of the Oregon guarantee: the historical preference for a citizen militia; 'the deterrence of government from oppressing unarmed segments of the population'; and, as noted earlier, the protection of the individual's right to bear arms to defend his or her person and home. *Id*. at 366-67. The court further determined that the term 'arms' was intended to include 'those

weapons used by settlers for both personal and military defense * * * [but] would not have included cannon or other heavy ordinance not kept by militiamen or private citizens.' *Id.* at 368.

"After generally concluding that Article I, section 27, 'includes a right to possess certain arms for defense of person and property,' *id.* at 377, the court in *Kessler* held that that constitutional provision protected the defendant's possession of the billy clubs, after concluding that a billy club qualified as the type of weapon 'commonly used for personal defense' at the time that the people adopted Article I, section 27, *id.* at 372. The court narrowed its ultimate conclusion, however, to the particular circumstances of the case before it, specifically holding that Article I, section 27, protected defendant's possession of billy clubs in his home."

*Id.* at 640 (second brackets in original).

Finally, the *Hirsch/Friend* court noted that, although the mere possession of an arm under Article I, section 27, is protected, a governmental entity may permissibly regulate the manner of possession and the use of constitutionally protected arms in circumstances outside the scope of Article I, section 27. *Id.* at 643. Those circumstances that are not within the scope of the constitutional protection may have at their core a public safety concern. *Id.* at 677. An example of a permissible regulation of the *manner of possession* of a protected arm, according to the court, would be the prohibition against the carrying of a concealed weapon. An example of a permissible regulation of the use of a constitutionally protected arm would be a prohibition against the use of a constitutionally protected arm for an unlawful purpose.

In summary, the Supreme Court case law under Article I, section 27, leads to the following understandings: (1) Unlike the analysis used in *Boyce*, the scope of protected conduct under Article I, section 27, does not include consideration of the city's power to regulate for purposes of public safety; (2) rather, the proper inquiry is whether the city's ordinance reaches conduct that is within the scope of protection under Article I, section 27; and (3) while Article I, section 27, precludes the legislature from prohibiting the mere possession or carrying of a constitutionally protected arm for

purposes of self-defense, a legislative branch of a governmental entity may regulate the manner of possession and the use of constitutionally protected arms for purposes related to public safety so long as that regulation does not infringe on the protected scope of the constitutional right to bear arms for self-defense.

The majority appears not to quarrel with the above principles or my understanding of the controlling case law. Rather, it takes a different tack by reading PCC 14A.60.010(A) to mean that the ordinance's prohibitory scope "includes only a person who has knowingly carried a loaded firearm in a public place for some purpose other than defense of self or home from felonious attack, consciously disregarding the substantial risk that doing so will endanger public safety." 249 Or App at 9. According to the majority,

> "[a] violation of the ordinance occurs, then, when a person (1) possesses or carries a loaded firearm in a public place; (2) knows that he or she is carrying or possessing the loaded firearm and that the place is public; (3) recklessly does so anyway, that is, is aware of the fact that carrying the loaded firearm in public creates an unreasonable, unjustifiable risk; and (4) nonetheless consciously disregards that risk and bears the firearm in a public place anyway."

249 Or App at 5-6 (emphasis omitted).

## I.  THE MAJORITY'S CONSTRUCT IS AT ODDS WITH THE CITY'S INTERPRETATION OF ITS OWN ORDINANCE

At the core of my disagreement with the majority is that its interpretation affords a meaning to the ordinance that has not been advanced by the city. Indeed, the majority effectively concedes that assertion when it states that,

> "[a]lthough neither party advances an interpretation of PCC 14A.60.010(A) that is precisely the same as the one we arrive at, the city does argue that the term 'unjustified' limits application of the ordinance to rare circumstances. In any event, this court is obligated to correctly interpret laws even if the parties do not. *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997)."

249 Or App at 10 n 5.

In reality, the interpretation of the ordinance advanced by the city is far different from the conduct that the majority asserts the ordinance prohibits. In particular, the city has never contended in this case that the ordinance applies only to "rare" circumstances. The city explains:

> "PCC 14A.60.010.A does not outlaw the 'mere possession' of a firearm, not even of a loaded firearm. Rather, it outlaws only the knowing possession of a loaded firearm in a *public place*, if the person has *recklessly* failed to remove the ammunition. And it does that only if a person does not come within one of the fourteen enumerated exceptions. PCC 14A.60.010.A is a 'permissible legislative regulation of the manner of possession.' "

(Citations omitted; emphasis in original.) In other words, under the city's interpretation, *any* possession of a loaded firearm in a public place unless exempted by the ordinance violates the ordinance, and the prohibitory scope of the ordinance extends even to the circumstance where the possessor attempts to unload the firearm but acts recklessly in that effort, resulting in the firearm remaining loaded. Thus, the city's interpretation of its own ordinance constitutes a blanket prohibition outlawing every circumstance of possessing a loaded firearm in a public place subject to the exemptions listed in the ordinance. Indeed, there would be no need for the promulgation of the list of exemptions in the ordinance if, as the majority asserts, the circumstances to which the ordinance applies are "rare."

Additionally, the majority's reliance on *Stull* is misplaced. PCC 14A.60.010(A) is a product of the exercise of legislative authority by the Portland City Council. The only issue before us is whether the city's interpretation of its ordinance is constitutional under Article I, section 27. This court has no authority to rewrite the city's ordinance by judicial fiat, and *Stull* does not authorize the majority to create its own interpretation of the ordinance in the circumstance of a constitutional challenge to an existing ordinance. In *Stull*, the issue was when a civil action is deemed commenced for the purposes of a statute of limitations enacted by the Oregon legislature. In resolving that issue, the court noted that its task was to discern the intent of the legislature and if that intent was clear from the text and context of the statute, then

the court's inquiry was at an end. 326 Or at 77. The court observed that, "[i]n construing a statute, this court is responsible for identifying the correct interpretation whether or not asserted by the parties." *Id.* The court then applied a "well-established meaning" of the word "filed" to define the meaning of the word. What was not at issue in *Stull* was the constitutionality of a statute, nor was there before the court a proffered interpretation by the legislative body that enacted the statute. Most importantly, the *Stull* court undertook with its analysis to ascertain what the legislature intended regarding the language that it used in the statute.

Because the lynchpin to any proper statutory interpretation is an inquiry regarding legislative intent, the majority, by authoring its own interpretation of the ordinance without taking into account what the city intended, materially departs from its obligation as a court reviewing the meaning of a legislative enactment. Rather, this court's obligation under controlling Supreme Court case law is to interpret laws consistently with the intent of their drafters in constitutional overbreadth challenges. *See State v. Rangel*, 328 Or 294, 304, 977 P2d 379 (1999) (when analyzing statute for constitutional overbreadth, a court "must keep faith with the legislature's policy choices, as reflected in the statute's words, and respect the legislature's responsibility in the first instance to enact laws that do not intrude on the [constitutional right]"). In this case, where the only issue is the constitutionality of the ordinance, the majority's failure to consider the interpretation advanced by the city of its own ordinance is a fatal flaw in its analysis.

## II. THE MAJORITY'S ANALYSIS IS INCONSISTENT WITH THE RULES OF STATUTORY CONSTRUCTION

The disagreement in this case about the meaning of the ordinance is not between the city and defendant; rather, it is between the majority and the parties. The disagreement has its genesis in the phrase "recklessly having failed to remove all the ammunition from the firearm" in the ordinance. According to the majority, the phrase results in the ordinance prohibiting solely the reckless possession of a

loaded firearm. Based on that premise, the majority concludes that the ordinance is constitutional under Article I, section 27. But, under the city's interpretation, the following conduct is made unlawful: (1) when a person knowingly or intentionally loads or leaves a firearm loaded while inhabiting a public place within the city; (2) when a person is found in possession of a loaded firearm in a public place within the city even though the person believed that the firearm was unloaded but the person recklessly failed to unload it; and (3) when a person is found in possession of an unloaded firearm and a loaded clip or magazine for the firearm even though the person believed the clip or magazine was unloaded but recklessly failed to unload it.

Assuming that the ordinance is ambiguous because of the "recklessly failing to remove ammunition" phrase, the governing rules of law regarding ambiguous legislative enactments require this court to construe the ordinance in accordance with the interpretation of the legislative body enacting it. *See, e.g.*, *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).[5] In the briefing of this case to determine the constitutionality of the ordinance, the city has offered evidence of its legislative intent. According to the city, its prior ordinance provided that

> "it is unlawful for any person on a public street or in a public place to carry a firearm upon his person, or in a vehicle under his control, or in which he is an occupant, unless all ammunition has been removed from the chamber and from the cylinder, clip, or magazine."

In this case, the city agrees with defendant, who contends that the ordinance prohibits possession of loaded firearms and asserts that "the only difference between the [ordinances]" is that the latter now includes a "*mens rea* requirement, that the failure to remove the ammunition be 'reckless.'" In other words, the present ordinance, as did the previous ordinance, continues to make it unlawful to possess

---

[5] A statute or ordinance is ambiguous when it is reasonably susceptible to more than one interpretation. Presumably, the majority must agree that the ordinance is susceptible to more than one reasonable interpretation. Otherwise, the majority puts itself in the untenable position of declaring that its interpretation is the only reasonable interpretation and that the city's interpretation of an ordinance that the city drafted is not reasonable.

or carry a loaded firearm in a public place within the city except as permitted by the exemptions to the ordinance. If the majority were to follow the established template for statutory interpretation, it would then be required to ascertain the intention of the City Council when it promulgated the ordinance. But, as is evident from its own admission, it has not done so.

Moreover, the failure of the majority to abide by the rules of statutory construction results in an additional conundrum. Under the majority's construction, if a person charged under the ordinance is permitted to testify that he or she reasonably perceived the need to carry a loaded firearm for the purpose of self-defense, and if that testimony, if believed by the factfinder, is sufficient to defeat a prosecution under the ordinance, then the majority has effectively written into the ordinance a self-defense exemption—an exception that the city admittedly did *not* include among the more than a dozen exceptions it enacted. But, by doing so, the majority violates ORS 174.010 by inserting into the ordinance "that which has been omitted."[6] On the other hand, if the majority's construction does not have the effect of inserting an exception for self-defense into the ordinance, then the ordinance infringes on the protection guaranteed by Article I, section 27, because, under the ordinance's language, there is no exception for the open carrying of a loaded firearm for self-defense.

### III.   THE MAJORITY'S INTERPRETATION FAILS TO INFORM A PERSON OR THE CITY WHEN THAT PERSON IS IN VIOLATION OF THE ORDINANCE

The ordinance makes the possession, or the carrying, of a loaded firearm unlawful. Thus, the prohibition of the ordinance is aimed at whether the firearm is loaded and not how it is used. Under the majority's construct, however, a

---

[6] ORS 174.010 provides:

"In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."

person violates the ordinance if the possession or carrying of the firearm in public creates an unjustifiable risk that the person consciously disregards. *See* 249 Or App at 6. Whether and when the risk of carrying a loaded weapon will become "unjustified" cannot be foreseen by a reasonable person.[7]

A contrast with the act of driving while impaired demonstrates the point. When a person drives a motor vehicle on a public highway while impaired by intoxicants, the law provides that such conduct can be evidence of "recklessness" as defined by statute because the risks of driving a motor vehicle while impaired are widely known and socially accepted, as reflected by the multiplicity of statutes proscribing that conduct. In contrast, there are no uniformly accepted societal norms, much less norms that have found their

---

[7] At a more fundamental level, the majority's reliance on the *statutory* definitions of "justification" when setting out the scope of the right to self-defense under Article I, section 27, is problematic. Although the majority frames its opinion as a construction of PCC 14A.60.010(A), the majority is, in fact, restricting the scope of the right to self-defense under Article I, section 27. Indeed, the majority must set out what it believes to be the outer limits of the scope of Article I, section 27, in order to conclude, as it does, that the ordinance does not infringe upon that right. *See* 249 Or App at 9-10. Although the majority points to *Hirsch/Friend* as the source of its conception of the scope of Article I, section 27, *Hirsch/Friend* is silent on that question because the issue in *Hirsch/Friend* was not what *conduct* falls within the scope of Article I, section 27, but rather *who* falls within the scope of the guarantee. *See* 338 Or at 677-78 (explaining legislature's retention of authority to "assess the threat to public safety that a *particular group* poses" (emphasis added)). The majority's reliance on *Hirsch/Friend* is unavailing, and, thus, the majority must be relying upon the legislatively defined term "unjustifiable risk" and related statutes governing justification defenses to delineate the scope of protected conduct under Article I, section 27. *See* 249 Or App at 6.

How the legislatively defined defenses to the crime of homicide are relevant to the scope of a constitutional guarantee enacted 114 years prior to the adoption of those statutes is not immediately apparent, but, in relying on ORS 161.219, the majority has effectively cabined the scope of the right to self-defense under Article I, section 27, to the narrow, legislatively drawn, grounds set out in that statute— *viz.*, where a person is confronted with a felonious attack, a burglary of a dwelling, or a threat of deadly physical force. *See* ORS 161.219(1) - (3). Doing so is inconsistent with our obligation to interpret constitutional provisions "in light of the way that wording would have been understood and used by those who created the provision" and then to apply those understandings to modern circumstances. *Vannatta v. Keisling*, 324 Or 514, 530, 931 P2d 770 (1997). As the historical materials I consider below demonstrate, it is unlikely that the framers of Article I, section 27, would have intended the right to bear arms in "defence of themselves" to be limited only to conduct falling within the limited circumstances set out in ORS 161.219.

expression in the law, that announce when the *mere carrying*, openly, of a loaded firearm constitutes an unjustified risk of harm to others.[8] The statutes relating to firearms overwhelmingly criminalize the *use* of firearms, the exceptions being laws proscribing possession of arms by persons outside the scope of Article I, section 27,[9] the possession of constitutionally unprotected arms,[10] and the carrying of concealed weapons, which, as described below, is a mode of carrying that likely falls outside the scope of Article I, section 27.[11] To put it bluntly: Our laws reflect a societal consensus that impaired persons are unjustifiable risks to the safety of others when they get behind the wheel. Our statutes do not reflect the same consensus with regard to the possession or carrying of loaded, constitutionally protected firearms by persons not excluded from the scope of Article I, section 27.

A possessor of a loaded firearm in a public place in the City of Portland cannot always reasonably anticipate when a loaded firearm is required for self-defense or when the possession of a loaded firearm results in an unjustified risk to others, because the need for the use of a firearm for self-defense is based solely on temporal and generally unexpected circumstances outside the control of the possessor of the firearm. A hypothetical example illustrates the difficulty with the majority's construct. Assume a person desires to hike in a public park that is part of a forest within the city. Concerned about the report of attacks against hikers in the park, the person determines before leaving his or her residence that a firearm may be required for purposes of

---

[8] What is implicit in the majority's opinion, *see, e.g.*, 249 Or App at 6, is that there is such a norm. The majority declines to make this assumption explicit, focusing instead on the risk posed by the *use* of firearms when it writes "[o]f particular relevance to [the ordinance] are provisions governing the use of 'deadly physical force,' *because the risk of misusing loaded firearms is presumptively deadly*." (Emphasis added.) However, PCC 14A.60.010(A) is silent regarding the *use* or *misuse* of firearms—it refers only to *possession* or *carrying* of firearms.

[9] *See, e.g.*, ORS 166.270 (criminalizing possession of firearms by convicted felons).

[10] *See, e.g.*, ORS 166.272 (criminalizing possession of machine guns, short-barreled firearms, and silencers); *see also Oregon State Shooting Assn. v. Multnomah County*, 122 Or App 540, 544-49, 858 P2d 1315 (1993), *rev den*, 319 Or 273 (1994) (describing types of constitutionally unprotected arms).

[11] *See, e.g.*, ORS 166.240 (unlawful carrying of concealed weapons); ORS 166.250 (unlawful possession of concealed firearms).

self-defense while hiking in the park. The ordinance requires that the person's firearm and the clip or magazine for the firearm be unloaded. The person attempts to comply with the ordinance, waiting to load the magazine or clip and insert a shell in the chamber of the gun until he or she arrives at the trailhead parking lot. The person then loads the gun, but, before the person can proceed into the forest, a group of children unexpectedly arrives at the parking lot.[12] Must the person immediately unload the firearm at that point in time because children are present, or may the person reasonably anticipate that a loaded firearm in his or her possession will not become an unjustified risk (by virtue of the person's training in firearms safety, for example) to the safety of others in the parking lot?

Assume further that the person with the loaded firearm proceeds into the forest and, coming around a corner on the forest path, encounters a group of children. Must that person unload the firearm until the children have left his or her presence? What if the person, after unloading the firearm, then encounters an attacker around the next corner? The point is that the need to exercise self-defense cannot always be predicted or reasonably anticipated, but, under the majority's interpretation, a person carrying a loaded firearm will have to make just that sort of prediction in order to avoid circumstances that a prosecution under the ordinance could consider to constitute an unjustifiable risk of carrying a loaded firearm.[13]

---

[12] I assume here, without deciding, that the presence of children suffices to imbue our hypothetical hiker's possession of a loaded firearm with an unjustifiable risk of harm.

[13] It is evident from the above hypothetical that the city could not have intended the ordinance to mean what the majority declares it to mean. The majority's interpretation renders the ordinance so indefinite that neither gun possessors nor the city can determine from its terms what conduct is prohibited, and, accordingly, the majority's interpretation has problematical implications regarding constitutional vagueness. As the Supreme Court has explained:

" 'The terms of a criminal statute must be sufficiently explicit to inform those who are subject to it of what conduct on their part will render them liable to its penalties.' *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985). A 'reasonable degree of certainty' about what conduct falls within the statute's prohibition is required; absolute certainty is not. *State v. Cornell/Pinnell*, 304 Or 27, 29-30, 741 P2d 501 (1987). In addition to giving fair notice of prohibited conduct, a criminal statute must not be so vague as to allow a judge or jury unbridled discretion to decide what conduct to punish. *Id.* at 29."

## IV. THE BREADTH OF THE ORDINANCE AS INTERPRETED BY THE CITY VIOLATES ARTICLE I, SECTION 27

A proper constitutional analysis of the ordinance requires the application of some general rules. A conclusion that a law is unconstitutionally overbroad means that the law prohibits conduct that a provision of the constitution protects against such a prohibition. *State v. Blocker*, 291 Or 255, 261, 630 P2d 824 (1981). To interpret a constitutional provision properly in light of a challenge that it is unconstitutional, a court is required to examine the text of the provision, the case law surrounding it, and the historical circumstances that led to its creation. *Priest v. Pearce*, 314 Or 411, 416, 840 P2d 65 (1992). The goal of the inquiry is to "understand the wording in light of the way that wording would have been understood and used by those who created the provision" and then to apply those understandings to modern circumstances. *Vannatta v. Keisling*, 324 Or 514, 530, 931 P2d 770 (1997). Finally, in considering the ordinance's constitutionality under Article I, section 27, this court does not have the authority to rewrite the ordinance so as to conform to its public policy expectations and thereby make it constitutional. To do so could violate the Separation of Powers Doctrine that distinguishes between the authority of the legislative branch and the judicial branch of government and could preempt the authority of a legislative body to create law in accordance with its own intentions. Rather, as the *Hirsch / Friend* court declared:

> "Before proceeding, we note that we are not unmindful of the controversy surrounding the right to bear arms and seemingly practical wisdom of prohibiting convicted felons from possessing firearms. However, as this court previously

---

*State v. Plowman*, 314 Or 157, 160-61, 838 P2d 558 (1992), *cert den*, 508 US 974 (1993). The majority's construction fails the benchmarks set out in *Plowman*. First, the majority's construction departs from the explicit terms of the ordinance to such an extent that no person—viewing the text of PCC 14A.60.010(A) in isolation—could realistically perceive "what conduct on their part will render them liable to its penalties." *Id.* Second, as highlighted by the hypothetical, the majority's gloss on the text of PCC 14A.60.010(A) drains that ordinance of whatever "reasonable degree of certainty" its text alone might have provided to those subject to it.

has explained, 'we are not free to interpret the constitution in any way that might seem to us to be sound public policy.' *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 66 n 19, 11 P3d 228 (2000). Rather, our task 'is to respect the principles given the status of constitutional guarantees and limitations by the drafters[.]' *State v. Kessler*, 289 Or 359, 362, 614 P2d 94 (1980)."

338 Or at 631-32. An analysis of the constitutionality of the city's ordinance under the above rules follows.

1.   *The implications from the text of Article I, section 27*

The analysis of the constitutionality of the city's ordinance begins with the text of Article I, section 27. As the Supreme Court held in *Blocker*, "the language [of Article I, section 27,] is not qualified as to place except in the sense that it can have no effect beyond the geographical borders of this state." 291 Or at 259. Thus, the restriction in the city's ordinance governing the carrying of loaded firearms in "public places" is not a restriction found in the text of Article I, section 27.

Next, the words "to bear" in Article I, section 27, during the period of time surrounding the adoption of the Oregon Constitution, were ordinarily understood to mean

"2.   To carry; to convey; to support and remove from place to place; as, 'they bear him upon the shoulder'; 'the eagle beareth them on her wings.'

"3.   To wear; to bear as a mark of authority or distinction; as, to bear a sword, a badge, a name; to bear arms in a coat."

Noah Webster, 1 *An American Dictionary of the English Language* (unpaginated) (1828). In other words, the phrase "to bear arms" in Article I, section 27, would have been ordinarily understood to include the possession of or the carrying of firearms (the words used in the city's ordinance) at the time of the adoption of the Oregon Constitution.[14]

---

[14] The word "bear" appears in only one other provision of the original constitution, Article X, section 2, which provided that "[p]ersons whose religious tenets, or conscientious scruples forbid them to bear arms shall not be compelled to do so in time of peace, but shall pay an equivalent for personal service."

In 1857, the word "defence" was defined, in part, as "any thing that opposes attack, violence, danger or injury; any thing that secures the person, the rights or the possessions of men[.]" Webster, 1 *An American Dictionary of the English Language* (unpaginated). Two legal dictionaries that are contemporaneous with the adoption of Article I, section 27, provide additional insight. One resource defines "defence" as

> "[a] forcible resistance of an attack by force. A man is justified in defending his person, that of his wife, children and servants, and for this purpose he may use as much force as may be necessary, even to killing the assailant, remembering that the means used must always be proportioned to the occasion."

John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America* 297-98 (1839). A second resource defines "defence" as follows:

> "The defence of oneself * * * is a right which belongs to persons. In these cases, if the party himself * * * be forcibly attacked in his person or property, it is lawful for him to repel force by force; and the breach of the peace which happens is chargeable upon him only who began the affray. Self-defence, therefore, as it is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society. In the English law, particularly it is held an excuse for breaches of the peace, nay, even for homicide itself[.]"

J. J. S. Wharton, *Dictionary of Jurisprudence* 220 (1860). The significance of those definitions of the word "defence" is that they operate to define the boundaries of the constitutionally protected conduct embodied in Article I, section 27.

2. *The implications from Oregon's historical circumstances*

Article I, section 27, is derived almost verbatim from Article I, sections 32 and 33, of the Indiana Constitution of 1851. *Kessler*, 289 Or at 363. There are no reported debates regarding the article, and the constitutional convention adopted it as the drafters originally proposed it. *Hirsch / Friend*, 338 Or at 643. Additionally, there were few statutes or ordinances regulating firearms in Oregon before, or immediately after, the adoption of the Oregon Constitution. Those

statutes that were in force proscribed only certain *uses* of fire-arms, thereby implicitly recognizing the right to bear arms for purposes of self-defense.

For example, the Portland City Council adopted Ordinance Number 8 in 1851, which provided, in pertinent part,

> "that no person be allowed to discharge any firearms within the limits of the city under a penalty of not less than five dollars for the first offense, nor more than ten dollars for each and every subsequent offense."

The city council enacted another ordinance in 1865 that also proscribed discharging firearms within certain portions of the city, but which also provided that "the marshal may permit upon national holidays and other days of Public Celebration any appropriate and orderly display of fire-arms[.]" Moreover, section 4 of Portland City Ordinance Number 228 (1865) provided, in part, that

> "[a]ny person or persons who shall draw any species of firearms, or any dirk, dagger, knife or other deadly weapon upon the person of another within the limits of the City of Portland shall on conviction thereof * * * be fined not less than five nor more than one hundred dollars and may be imprisoned for any period not exceeding twenty days."

Also in 1865, the City of Portland adopted Ordinance Number 283 banning the carrying of concealed weapons. That ordinance provided:

> "Sec. 1   It shall be unlawful for any person or persons to carry any firearms or deadly weapons of any kind in a concealed manner within the corporate limits of the City."

The copy of the ordinance in the city's archives contains inter-lineations, possibly made during the drafting stage, that excised language that would have barred the carrying of weapons openly. The 1865 ordinance is an example of a per-missible law under Article I, section 27, that regulates the manner of carrying a firearm and implicitly recognizes the open carrying of loaded firearms for self-defense purposes.

Finally, the city relies on Oregon Laws 1853, chapter 16, section 17, as an example of a constitutionally permissible

law regulating the carrying of firearms in public. That law provided:

> "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault, injury, or other violence to his person, or to his family or property, he may, on complaint of any other person, having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right to appealing as before provided."

In my view, that ordinance is a classic example of a law that regulates the use of weapons for unlawful purposes and not for purposes of self-defense. The statute specifically requires as an element that the actor act "without reasonable cause to fear an assault, injury, or other violence to his person" and in such a manner as to cause another to "fear an injury." Thus, by its terms, the statute would have been inapplicable to an individual who openly carried arms for the purpose of self-defense.

In summary, no contemporaneous Oregon territorial laws existed regulating the *places* where loaded firearms could be openly carried for self-defense purposes. Rather, the laws in effect at the time of the adoption of Article I, section 27, regulated only the manner of possession or the use of firearms for purposes other than self-defense.

3. *Contemporaneous state constitutions and constitutional decisions interpreting those constitutions*

Given the intensity of scholarly attention devoted to the interpretation of the Second Amendment, and the relevance of state constitutions to that inquiry, it is possible to identify the universe of state constitutional right to bear arms cases decided by state supreme courts before 1859.[15] Before the adoption of Article I, section 27, nine state supreme courts had decided challenges to firearms or concealed weapons laws under either their state constitutions

---

[15] See, for example, Dave Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L Rev 1359, 1418-36 (1998), and footnotes therein for a compilation of state cases decided under both the Second Amendment and state constitutions in the nineteenth century.

or, in Louisiana and Georgia, which did not have such provisions, the Second Amendment.[16] Those cases can be divided into two categories. Of the seven states that have decided cases under their own constitutional provisions, four of the states had constitutional provisions that included text similar to the "defence of themselves" text in Article I, section 27. The language in the "right to bear arms" provisions in the remaining three constitutions[17] guaranteed the right of the

---

[16] The Supreme Court of Georgia, in *Nunn v. State*, 1 Ga 243, 1846 WL 1167, *11 (1846), held that a ban on carrying concealed weapons did not violate the Second Amendment, reasoning that

"[w]e are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and is *void*[.]"

(Emphasis in original.) The Louisiana Supreme Court in *State v. Chandler*, 5 La Ann 489, 1850 WL 3838, *1 (1850), also upheld a ban on carrying concealed weapons against Second Amendment challenge, holding that

"[t]his law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and un-manly assassinations."

*See also State v. Smith*, 11 La Ann 633, 1856 WL 4793 (1856) (same); *State v. Jumel*, 13 La Ann 399, 1858 WL 5151 (1858) (same). The relevance of the Georgia and Louisiana decisions, for my purposes, is that they illustrate the distinction reached by many courts between the concealed carrying of arms, which could be proscribed, and the open carrying of arms, which was viewed as within the scope of the right to bear arms.

[17] The city relies on a number of cases from those three states, including *Amyette v. State*, 21 Tenn 154, 1840 WL 1554 (1840), and another decision from Tennessee, *Tally v. Ayres*, 35 Tenn 677, 1856 WL 2481 (1856), which the city argues demonstrate that "the right to keep and bear arms did not encompass the right to carry them in public places." *Tally* does not stand for that proposition. *Tally* was a tort case—not a constitutional case—involving a man who carried his rifle into town, set it down, and, when he went to pick it up again, the gun fired, killing a mare that had been hitched nearby. The evidence showed that the discharge had been accidental, and the plaintiff argued that, because his act of carrying the rifle had been lawful, and the discharge accidental, he should not be held liable for the damage caused. The court rejected that argument, holding that "[t]he lawfulness of the act from which the injury resulted is no excuse for the negligence, unskilfulness [sic], or reckless incaution of the party." *Id.* at *2. Accordingly, the plaintiff was held liable for the damage that he caused. The city relies on the *Tally* court's statement that

people to bear arms for their *"common* defence."[18] (Emphasis added.)

        Also, although the cases reflect a near-universal pro-scription of the carrying of concealed weapons, no case, with

---

"[t]he act of taking a loaded gun into a place of public resort—no necessity or cause being shown for doing so—and leaving it exposed in the store, was an uncalled for and reckless act; and the very fact that the gun 'went off,' under the circumstances detailed in the proof, implies, of necessity, some inadvertent act, or want of proper caution, on the part of the defendant."

*Id.* This statement does not support the city's contention. Rather, it demonstrates how individuals engaged in the lawful act of carrying firearms were nonetheless liable for any harm that came from their negligent use of those firearms.

[18] The Supreme Court of Arkansas held in *State v. Buzzard,* 4 Ark 18, 1842 WL 331, \*6 (1842), that a ban on the carrying of concealed weapons by persons who were not "on a journey" did not violate the Arkansas Constitution because the *"sole object* of [the provision] in securing this right was to provide, beyond the [power of legal] control, adequate means for the preservation and defense of the State and her republican institutions." (Emphasis added.) The court noted that, in other states "the language used [in right to bear arms provisions] appears to be different from and more comprehensive than that used either in the Constitution of the United States or of this state." The Arkansas Constitution of 1836 had provided "[t]hat the free white men of this state shall have a right to keep and bear arms for their common defence." Art II, § 21 (Ark 1836), *reprinted in* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms,* 11 Tex Rev Law & Pol 191, 194 (2006).

Likewise, the Supreme Court of Tennessee upheld a ban on carrying concealed Bowie knives in *Amyette,* 21 Tenn at \*4, reasoning that

"[t]he right to bear arms is not of that unqualified character. The citizens may bear them for the common defence; but it does not follow that they may be borne by an individual, merely to terrify the people or for purposes of private assassination. And, as the manner in which they are worn and circumstances under which they are carried indicate to every man the purpose of the wearer, the Legislature may prohibit such manner of wearing as would never be resorted to by persons engaged in the common defence.

"\* \* \* \* \*

"And, as in their constitution the right to bear arms in defence of them-selves is coupled with the right to bear arms in defence of the State, we must understand the expressions as meaning the same thing, and as relating to pub-lic, and not private, to the common, and not the individual, defence."

Both *Amyette* and *Buzzard* illustrate that nineteenth-century courts were aware of the textual diversity of right to bear arms provisions and that courts relied on those textual differences in reasoning about the validity of concealed weapons laws. Unlike the courts that upheld such laws under constitutions providing a right to bear arms for "the defense of themselves," the courts in Tennessee and Arkansas did not have to determine whether such bans were consistent with an individual right to self-defense. As such, the reasoning of those decisions is of limited utility in discerning how the founders of the Oregon Constitution would have conceived of the scope of the individual right to self-defense expressly secured by Article I, sec-tion 27, in addition to the right to bear arms for defense of the state.

the exception of two decisions from North Carolina grounded in racially exclusionary reasoning, upheld, or endorsed, a ban on the open carrying of arms in public for self-defense.[19]

I now turn to supreme court decisions decided before 1859 under state constitutions guaranteeing the right to bear arms for the "defense of himself," or the "defence of themselves."[20] Those states were Indiana, Kentucky, Alabama, and Texas. The Indiana Constitution of 1820 had contained an arms guarantee "virtually identical" to Article I, section 27. *Hirsch/Friend*, 338 Or at 644. In 1833, the Supreme Court of Indiana announced, in a one-sentence opinion in *State v. Mitchell*, 3 Blackf 229, 1833 WL 2617 (Ind 1833), that "[i]t was *held* in this case, that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional." (Emphasis in original.) When language was introduced at the 1850 Indiana constitutional convention that would have overturned the holding in *Mitchell* regarding concealed weapons, the proposal was rejected because, as one delegate explained,

> "[h]e was opposed to the reported section from a fear that it might possibly be so construed as to deprive the Legislature

---

[19] *See, e.g., State v. Newsom*, 27 NC 250, 1844 WL 1059, *2 (1844); *State v. Dempsey*, 31 NC 384, 1849 WL 1305, *2 (1849).

[20] In *State v. Shoultz*, 25 Mo 128, 1857 WL 5470 (1857), the Supreme Court of Missouri opined as to the meaning of its state constitution in the context of upholding the rejection of the defendant's proffered jury instruction. The defendant was convicted of murdering another man by shooting him with a pistol. *Id.* at *2. On appeal, he challenged a number of the jury instructions given, along with the trial court's decision not to give an instruction that he had requested. As the court explained,

> "[a]s to the instruction in regard to the constitution of Missouri, that the people's right to bear arms in defense of themselves cannot be questioned, and that no presumption ought to arise in the minds of the jury from the defendant's going armed with a pistol, it could not possibly aid the jury in their deliberations. This right is known to every jury man in our State, but nevertheless the right to bear does not sanction an unlawful use of arms. The right is to bear arms in defense of ourselves. There was no injury to defendant by refusing this instruction."

*Id.* at *12. The Missouri Constitution of 1820 had provided

> "[t]hat the people have the right peaceably to assemble for their common good, and to apply to those vested with the powers of government for redress of grievances by petition or remonstrance; and that their right to bear arms in defence of themselves and of the State cannot be questioned."

Art XIII, § 3 (Mo 1820), *reprinted in* Volokh, 11 Tex Rev Law & Pol at 199.

of power to prohibit the carrying of concealed weapons. The practice of carrying concealed weapons was one of the most dastardly, odious, and murderous practices that was ever tolerated in the civilized world, and unquestionably there was not a gentleman on that floor who would not feel shocked at the idea that no such prohibition could be passed."

*Hirsch/Friend*, 338 Or at 645 (quoting 2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 1850* at 1391).

In its review of the debate that occurred at the Indiana convention, the *Hirsch/Friend* court observed:

"The foregoing debate is helpful to our analysis here, because it demonstrates that the framers of the Indiana Constitution of 1851—while generally protective of the right to bear arms—nonetheless did not intend that the right extend so far as to preclude legislative regulation respecting the carrying of concealed weapons. Stated differently, in rejecting proposed wording that expressly prohibited legislative restriction, and in adopting the wording previously construed in *Mitchell*, the drafters of the Indiana Constitution of 1851 demonstrably did not intend to deprive the state legislature of the authority to regulate a particular aspect of the right to bear arms that related to public safety. That, in turn, supports this court's conclusion in *Kessler* that the guarantee set out in Article I, section 27, of the Oregon Constitution was subject to certain regulatory authority on the legislature's part—at the least, the authority to prohibit the carrying of concealed weapons and, possibly, a broader authority to act to prevent threats to public safety."

338 Or at 646. What is necessarily implicit from the convention debate is the convention's recognition of the right to openly carry arms in public for purposes of self-defense.

Also, similar to the text of Article I, section 27, the text of the Kentucky Constitution of 1792 provided "[t]hat the rights of the citizens to bear arms in defence of themselves and the State *shall not be questioned.*" Art XII, cl 23 (Ky 1792), *reprinted in* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex Rev Law & Pol 191, 197 (2006) (emphasis added). In *Bliss v. Commonwealth*, 12

Ky 90, 1822 WL 1085 (1822), the Supreme Court of Kentucky struck down a ban on the carrying of concealed arms on the ground that it violated the state constitutional right to bear arms. Bliss had been convicted under a statute providing

> "[t]hat any person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum not less than one hundred dollars; which may be recovered in any court having jurisdiction of like sums, by action of debt, or on presentment of a grand jury."

*Bliss*, 12 Ky at *1. The court rejected the commonwealth's argument that the statute was merely a permissible regulation on the manner of carrying arms. But as the court explained:

> "That the provisions of the act in question do not import an entire destruction of the right of the citizens to bear arms in defense of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons concealed in the manner described in the act, they may, nevertheless, bear arms in any other admissible form. But to be in conflict with the constitution, it is not essential that the act should contain a prohibition against bearing arms in every possible form—it is the right to bear arms in defense of the citizens and the state, that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution.
>
> "Not merely all legislative acts, which purport to take it away; but all which diminish or impair it as it existed when the constitution was formed, are void."

*Id.* at *2.

Twenty-eight years after *Bliss* was decided, Kentucky adopted its second constitution and explicitly provided the legislature with authority to ban the carrying of concealed weapons. Under its newly adopted constitution, Kentucky's right to bear arms guarantee provided "[t]hat the rights of the citizens to bear arms in defense of themselves and their State shall not be questioned; but the General Assembly may pass laws to prevent persons from carrying

concealed arms." Art XIII, § 25 (Ky 1850); *see Posey v. Comm.*, 185 SW3d 170, 189 (Ky 2006) (Scott, J., concurring in part, dissenting in part) (describing evolution). The Kentucky experience bears on the meaning of Article I, section 27, because Indiana patterned its arms provision in the Indiana Constitution of 1816 after the language of the Kentucky Constitution of 1792 and, as noted, Oregon essentially adopted the Indiana provision. *Hirsch/Friend*, 338 Or at 646.

*Bliss* appears to be the first appellate decision construing a state constitutional arms provision. *Hirsch/Friend*, 338 Or at 647. Nonetheless, the Indiana Supreme Court did not follow the *Bliss* court's interpretation in *Mitchell*, nor did it adopt its reasoning in its constitutional convention, further reinforcing the understanding that the Oregon drafters would not have understood the scope of the right to bear arms in self-defense in Article I, section 27, to extend to concealed arms for purposes of self-defense.

At the time of the adoption of Article I, section 27, Alabama's constitutional right to bear arms provision provided "[t]hat every citizen has a right to bear arms in defense of himself and the state." Art I, § 27 (Ala 1819), *reprinted in* Volokh, 11 Tex Rev Law & Pol at 193. In *State v. Reid*, 1 Ala 612, 1840 WL 229 (1840), the Alabama Supreme Court held that a law enacted "to suppress the evil practice of carrying weapons secretly" did not violate the state constitution. The law provided

> "that if any person shall carry concealed about his person, any species of fire arms, or any Bowie knife, Arkansaw [*sic*] tooth pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending, shall on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the judge of said court."

1 Ala at *2.[21] The court reasoned that

---

[21] "Bowie knives" were viewed, in the middle part of the nineteenth century, much as "assault weapons" are viewed today. As the Tennessee Supreme Court explained in *Day v. State*, 37 Tenn 496, 1858 WL 2780, *2 (1858):

> "So, it will be seen, that the Legislature intended to abolish these most dangerous weapons entirely from use, as unfit to be worn and used in a

> "[t]he constitution in declaring that, 'Every citizen has the right to bear arms in defence of himself and the State,' has neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guarantied [*sic*] to the citizen, is not to bear arms upon all occasions and in all places, but merely 'in defence of himself and the State.' The terms in which this provision is phrased seems to us, necessarily to leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."

*Id.* at *3. The court then emphasized that, whatever the authority of the legislature to enact laws regulating the manner of bearing arms,

> "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional. But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution."

*Id.*

The Alabama court distinguished the holding in *Bliss* because the Alabama Constitution did not contain the "peculiar terms employed in the Kentucky Constitution, *viz.*, 'That the right of the citizens to bear arms, &c. *shall not be questioned.*'" *Id.* at *5 (emphasis in original). Rather, the

---

Christian and civilized community for any purpose, so far as severe penalties could accomplish that object. They were induced to do this on account of the savage character of the instrument and for the saving of blood."

*Day* was not a constitutional case but instead was a challenge to the application of a ban on the drawing of Bowie knives from concealment as infringing on the defendant's natural right to self-defense. The defendant had been charged with maliciously drawing a Bowie knife from a place of concealment, and the court concluded that "[t]he right of self-defense is not denied, but this particular instrument is prohibited in the exercise of that right, if it 'be drawn from any place of concealment about the person,'" accordingly, "[i]f men wish to escape these severe consequences, let them discontinue the use of these most dangerous, and bloody weapons." *Id.* at *3.

court approved of the holding in *Mitchell*, reasoning that "the difference between the terms used in the constitution of Indiana, and that of our own state, is so entirely immaterial, that it could not possibly authorize a difference of construction." *Id.* at *6. Accordingly, and after concluding that the defendant had not demonstrated any necessity that could have rendered his carrying of a concealed weapon "indispensable to the right of defence," the *Reid* court affirmed the defendant's conviction. *Id.* at *7.

 *Reid* comments on the historical understanding of the right to bear arms for self-defense purposes in several ways. First, the *Reid* court interpreted a state right to bear arms provision substantially identical to Article I, section 27, and its holding was grounded on the right to armed self-defense. As the court noted, the act of openly carrying weapons was, to its mind, the only way such weapons could be "efficiently used *for defence.*" *Id.* at *6 (emphasis added). Second, the court held that the right to bear arms was not a right "to bear arms upon all occasions and in all places, but merely 'in defence of himself and the State.' " *Id.* at *3. Third, the *Reid* court recognized the legislature's authority to regulate the manner of the possession of arms in the interest of public safety. And, fourth, the *Reid* court also recognized a kind of "overbreadth" limitation on the legislature's authority to regulate "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." *Id.*

 Finally, I turn to the text of the Texas Constitution of 1845, which provided that "[e]very citizen shall have the right to keep and bear arms, in the lawful defense of himself or the state." Art I, § 13 (Tex 1845), *reprinted in* Volokh, 11 Tex Rev Law & Pol at 203. In *Cockrum v. State*, 24 Tex 394, 1859 WL 6446 (1859), the Texas Supreme Court held a law constitutional providing that any homicide that would normally be manslaughter would be elevated to murder if committed with a Bowie knife. The court reasoned that "[t]he right to carry a bowie-knife for lawful defense is secure, and must be admitted," however, because the Bowie knife was an

"instrument of almost certain death[,] [h]e who carries such a weapon, for lawful defense, as he may, makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon." *Id.* at *7. Because of that increased danger, a law providing for increased penalties for the unlawful use of the Bowie knife would be in "accordance with the well-established maxim of law, that 'you must so use your own as not to injure others.' " *Id.* The court was careful to note that

> "[s]uch admonitory regulation of the abuse must not be carried too far. * * * For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right."

*Id.* at *8.

Thus, the *Cockrum* court, like the *Reid* court, recognized a kind of "overbreadth" limitation on a legislature's authority to enact regulations on the manner of possessing weapons; a legislature could so legislate as long as the regulation did not "deter the citizen from [the] lawful exercise" of the right to armed self-defense.

In summary, a survey of the pertinent nineteenth-century case law demonstrates that the right to bear arms provisions of state constitutions mirroring Article I, section 27, were interpreted by courts to be subject to legislative regulation for the protection of public safety but were otherwise absolute in their guarantee of the right to bear arms openly for purposes of self-defense. In particular, courts in states with "defence of themselves"-type arms guarantees appear to be unanimous that the open carrying of firearms in public was within the scope of the individual right to armed self-defense secured by state constitutions.

4. *The mid-nineteenth-century common law*

The city relies on what it characterizes as a common-law tradition of regulating the carrying of arms in public, beginning with the Statute of Northampton (1328) and then emerging in this country as the common law of "affray." According to the city, any application of the ordinance "is not substantial in relation to the Ordinance's legitimate

sweep."[22] Although the precise elements of the common-law offense of "affray" are debatable, my review of the common law, as explained more fully below, leads me to conclude that, although the common-law tradition may have criminalized the carrying of arms for unlawful purposes, that tradition also recognized the traditional right to carry arms for the lawful purpose of self-defense.

As an initial matter, no reported Oregon case decided contemporaneously with the adoption of the Oregon Constitution that I have been able to find mentions the common-law crime of affray, and no Oregon cases, other than *Kessler* and *Hirsch / Friend*, cite the Statute of Northampton, the genesis of the city's argument.[23]

The Statute of Northampton, implemented by King Edward III and Parliament in England in 1328, made it unlawful "to go nor ride armed by night nor by Day in Fairs, Markets, nor in the Presence of Justices or other Ministers nor in no Part elsewhere." 2 Edw c. 3 (1328). Commentators are split as to the interpretation of the statute. One commentator maintains that "the most important aspect of the Statute of Northampton is that it contains no intent requirement for the conduct to be otherwise unlawful." Patrick J. Charles, *Scribble Scrabble, the Second Amendment and Historical Guideposts*, 105 NW U L Rev Coll 227, 237 (2010). Another commentator points out that, under a seventeenth-century

---

[22] The city's argument in this respect is contrary to the Supreme Court's controlling analysis in *Hirsch / Friend* and *Eckles*, as discussed above. As the *Hirsch / Friend* court emphasized in rejecting the "police power" rationale for restrictions on the bearing of arms, the question of whether a law impinges upon conduct protected by Article I, section 27, is not answered by " 'balancing' it against another of the state's interests or obligations, such as protection of the 'vital interests' of the people; rather, any constitutional limitations on the state's actions 'must be found within the language or history' of the constitution itself." *Hirsch / Friend*, 338 Or at 639 (citation and some internal quotation marks omitted).

[23] The word "affray" does appear in Oregon case law contemporaneous with the adoption of the constitution, but is used in its generic sense to refer to a brawl or public fight. *See, e.g., Newby v. Territory*, 1 Or 163, 164 (1855) (reciting the defendant's argument that a jury instruction on the crime of riot was erroneous because "it is too broad and general in its terms, and might involve the casual spectator of an affray in punishment with those perpetrating the crime"); *see also Pendergrast v. Lampman*, 19 F Cas 139, 140 (D Or 1863) (describing the libellant's injuries as "a trifling affair, and may have occurred by the libellant's striking against the carpenter's chest or chain cable in the vicinity of the affray").

decision from the King's Bench in England, "to sustain a conviction proof was required that the accused had gone armed 'malo animo' (with evil intent) or 'to terrify the King's subjects.'" Janet Knopp, *State Constitutions and the Right to Bear Arms*, 7 Okla City U L Rev 177, 202 n 105 (1982) (citing *Rex v. Knight*, 87 Eng Rep 75, 90 Eng Rep 330 (KB 1686)). It seems clear, however, that the requirement that an armed person "go offensively" in order to violate the statute was also well recognized. *See* M. Dalton, *The Countrey Justice* 31 (London 1622), *as cited in* Knopp, 7 Okla City U L Rev at 202 n 105.[24]

Indeed, the *Hirsch/Friend* court reviewed the English common law and colonial American history extensively, which led it to conclude:

"Turning to the broader historical background, we first reiterate the purpose of the English right to bear arms set out in the Bill of Rights of 1689, which served as the origin

---

[24] The city relies on the North Carolina case *State v. Huntly*, 25 NC 418, 1843 WL 891, *1 (1843), in support of its reading of the common law of affray. There, the defendant had armed himself with a shotgun, pistols, and knives and, in public, "did openly and publicly declare a purpose and intent * * * to beat, wound, kill and murder[.]" For that conduct, he was tried for the crime of affray. The court reviewed the Statute of Northampton and Blackstone, as well as other commentators' views on the crime of affray, and then held that,

"[i]ndeed, if those acts be deemed by the common law crimes and misdemeanors, which are in violation of the public rights and of the duties owing to the community in its social capacity, it is difficult to imagine any which more unequivocally deserve to be so considered than the acts charged upon this defendant. They attack directly that public order and sense of security, which it is one of the first objects of the common law, and ought to be of the law of all regulated societies, to preserve inviolate—and they lead almost necessarily to actual violence. * * *

"The bill of rights in this State secures to every man indeed, the right to 'bear arms for the defence of the State.' While it secures to him a *right* of which he cannot be deprived, it holds forth the *duty* in execution of which that right is to be exercised. If he employ those arms, *which he ought to wield for the safety and protection of his country*, to the annoyance and terror and danger of its citizens, *he deserves but the severer condemnation for the abuse of the high privilege*, with which he has been invested."

*Id.* at *2 (third and fourth emphases added).

The utility of *Huntly* for determining the scope of the right to bear arms under Article I, section 27, is limited because, as noted above, the North Carolina Constitution protected only the right to bear arms for the "defence of the state." However, contrary to the city's proffered reading, *Huntly* is instructive because it reinforces the distinction between the lawful bearing of arms for purposes protected by the state constitution and the abuse of that right by persons who use arms unlawfully.

for the American right. As discussed earlier, the drafters of that document were primarily concerned with the Crown's disarming of religious dissidents, who were 'law-abiding' citizens and 'good Subjects,' through application of the Militia Act of 1662. Nothing in the history of the English right suggests that the drafters of the English Bill of Rights intended the arms provision to preclude the disarmament of serious lawbreakers; indeed, the refusal of the King's Bench in 1686 to enforce firearms restrictions against law-abiding citizens reinforces that reading of the history. That, in turn, counters any notion that the traditional right to bear arms inherited from England provided an absolute guarantee to those who violate criminal laws.

"We find another important aspect of the history of the American right to bear arms, as inherited from England, in the political philosophies of the American founders and framers of the Second Amendment. The founders indisputably viewed the right to bear arms as fundamental to a free society, because it provided a mechanism whereby the people could act to prevent oppression and tyranny *and also to protect their principal rights of personal security, personal liberty, and private property.* * * *

"* * * * *

"Relatedly, the political view of the 'virtuous citizen,' also prevalent at the time of the founding, suggested that the right to bear arms carried with it the responsibility for upstanding citizenship, which in turn required the willing taking up of arms both to hunt down and to defend against those who threatened the safety of the community. Under that view, as many scholars and commentators have concluded, upon violating the social compact between the citizenry and society—and, simultaneously, the duty to act as a virtuous citizen—by committing serious crime, the lawbreaker's right to bear arms is subject to restriction.

"A final significant aspect of the history surrounding Article I, section 27, is the historical practice—both in England and in colonial America—respecting the regulation of the bearing of arms and the use of arms to defend against criminal activity. As discussed, those societies generally directed such regulations toward public safety concerns—such as restrictions extending to those who posed a threat to the public peace or who were perceived to pose such a threat, and other prohibitions on the carrying of

concealed weapons and the carrying of weapons or shooting of weapons in towns or crowded areas. * * * Finally, in both seventeenth-century England and in colonial America, society viewed the criminal element as a segment of the population that the law-abiding citizenry was obliged to hunt down and bring to justice, *so as to protect oneself and one's community.*"

338 Or at 675-77 (emphases added).

The Supreme Court of Tennessee confronted an argument similar to the city's argument regarding the common law of "affray" and the Statute of Northampton in *Simpson v. State*, 13 Tenn 356, 1833 WL 1227, *1 (1833), and rejected it in light of the Tennessee constitutional right to bear arms. In that case, the court explained:

"But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute [of Northampton], or portion of the common law, *our constitution has completely abrogated it*; it says, 'that the freemen of this state have a right to keep and to bear arms for their common defence.' Article 11, sec. 26.

"It is submitted, that this clause of our constitution fully meets and opposes the passage or clause in *Hawkins*, of 'a man's arming himself with dangerous and unusual weapons,' as being an independent ground of affray, so as of itself to constitute the offence cognizable by indictment. By this clause of the constitution [Article I, sec. 26], an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature; and it is conceived, that it would be going much too far, to impair by construction or abridgment a constitutional privilege which is so declared; neither, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed *such a necessarily consequent operation as terror to the people to be incurred thereby*; we must attribute to the framers of it the absence of such a view."[25]

*Id.* (emphasis added).

[25] The Tennessee court in *Amyette* disavowed this portion of *Simpson* as being inconsistent with its construction of the "common defence" purpose of the Tennessee guarantee. *See* 21 Tenn 154, 1840 WL 1554, *6. In contrast, Article I, section 27, embodies a right to bear arms "for the defence of themselves, *and* the State." (Emphasis added.)

### 5. *The analysis of the constitutionality of the city's ordinance in light of the above information*

I begin with the wording in Article I, section 27, as it would have been understood and used by those who created the provision, and I attempt to apply faithfully the principles embodied therein to modern circumstances as those circumstances arise. "Article I, section 27, clearly guarantees the right to bear arms for purposes of *defense*—specifically, 'for the defence of [the people] themselves, and the State.'" *Hirsch/Friend*, 338 Or at 632 (emphasis and brackets in *Hirsch/Friend*). Moreover, Article I, section 27, does not on its face restrict the locations or places where the right to bear arms for purposes of self-defense can be exercised. As I have observed above, it is the concept of self-defense embodied within the language of the provision that operates to limit the scope of the right to bear arms under Article I, section 27. *Id.*

PCC 14A.60.010(A) provides that "[i]t is unlawful for any person to knowingly possess or carry a firearm, in or upon a public place, including while in a vehicle in a public place, recklessly having failed to remove all the ammunition from the firearm." "Public place" for purposes of the ordinance is defined as any

> "publicly or privately owned place to which the general public has access and may include but is not limited to public property and areas of private property open to the public, such as spaces within apartment houses and hotels not constituting rooms or apartments designed for actual residence, schools, places of amusements, parks, playgrounds, and premises used in connection with public passenger transportation."

PCC 14A.10.010(O).

The ordinance is not an ordinance that purports to regulate the unlawful use of a firearm, and the city does not contend otherwise. Whether the ordinance constitutes a constitutionally permissible regulation of the manner of possession of a firearm requires a more in-depth analysis. The first step of analysis examines the regulation of the possession of or the carrying of loaded firearms in "public places" as

defined by the ordinance. As noted above, Article I, section 27, contains no textual restriction as to the places where firearms may be carried openly for purposes of self-defense. Consequently, any constitutional limitation on public places where firearms may be carried openly for purposes of self-defense must be implicit in the "defence of themselves" language in the provision.

Assuming without deciding that the regulation of loaded firearms by a legislative branch of government is constitutionally permissible regarding some public places,[26] the city's ordinance prohibits the possession of loaded firearms in all public places as defined by the ordinance, including private areas open to the public unless exempt under the ordinance. *See* PCC 14A.10.010(O). It is the breadth of the scope of the definition of "public places" in the ordinance that is constitutionality problematic in light of the historical circumstances discussed above. In the universe of public places, there are some public places where, historically, the possession or carrying of loaded firearms openly would have been within the contemplation of the framers of Article I, section 27, *e.g.*, remote roads, forested areas, waterways, and "private property open to the public," such as the curtilage of private homes.[27] Even if (under the city's argument) a person does not act "recklessly" if the person fails to unload a firearm when confronted with the need to act in self-defense, that person continues to be in violation of the ordinance

---

[26] There is historical precedent for such regulations. *See, e.g.*, *Hill v. State*, 53 Ga 472 (1874) (upholding law barring the carrying of arms in courthouses). The Georgia Constitution of 1868 mirrored the Second Amendment, while also providing the legislature the authority to regulate "the manner in which arms may be borne." Art I, § 14 (Ga 1868), *reprinted in* Volokh, 11 Tex Rev Law & Pol at 195.

[27] I note here that this conclusion is consistent with conclusions reached by other state courts that have considered similar challenges. *See, e.g.*, *In re Brickey*, 70 P 609, 609 (Idaho 1902) (ban on open carry of firearms within "limits or confines of any city, town or village" violated state constitutional right to bear arms); *State v. Rosenthal*, 55 A 610, 610 (Vt 1903) (law banning carrying of pistols within city limits, without first obtaining a discretionary permit issued by city officials, violated state constitutional right to bear arms); *City of Las Vegas v. Moberg*, 485 P2d 737, 738 (NM Ct App 1971) (municipal ordinance banning open carry of firearms violated state constitutional right to bear arms); *City of Lakewood v. Pillow*, 501 P2d 744, 745-46 (Colo 1972) (municipal ordinance that made it unlawful to "carry or possess a dangerous or deadly weapon" unconstitutionally overbroad in violation of state constitutional right to bear arms).

because of the mere possession of a loaded firearm in a public place.

The city's final argument is that, because the ordinance exempts certain people from regulation, it does not infringe on the right to bear arms for self-defense. However, Article I, section 27, does not by its terms restrict the scope of its guarantee to certain groups of people, and not every person would be able to qualify for an exemption under the ordinance. Importantly, the ordinance does not contain an exemption for the carrying of a loaded firearm for the purpose of self-defense, which, as described above, is at the core of the Article I, section 27, right. Consequently, it is a *non sequitur* to argue that a list of exemptions in the ordinance operates to render the ordinance's prohibition constitutional, particularly where there is no exemption for the very activity—the bearing of arms for self-defense—that Article I, section 27, explicitly protects.

In summary, I am persuaded of the unconstitutionality of PCC 14A.60.010(A) because of the breadth of the ordinance's definition of a "public place." The framers of Article I, section 27, and the citizens of Oregon who adopted that provision as part of our state constitution, could not have contemplated that a citizen could be prohibited from bearing constitutionally protected arms for self-defense in all public places and private properties open to the public.[28] In light of the standard of review required by *Hirsch/Friend* to determine if the ordinance prohibits constitutionally protected conduct of any kind, I would conclude that the trial court

---

[28] That conclusion is reinforced by the Supreme Court's explanation in *Hirsch/Friend* of the philosophical underpinnings of the Article I, section 27, guarantee. As the Court explained:

"[T]he right to bear arms carried with it the responsibility for upstanding citizenship, which in turn required the willing taking up of arms both to hunt down and to defend against those who threatened the safety of the community."

338 Or at 676.

I find it incongruous to conclude that the framers of Article I, section 27, would have simultaneously believed in the duty of arms-bearing citizens to aid in the apprehension of law-breakers and yet also would have countenanced a total proscription on the bearing of loaded firearms for self-defense in all public places and private places open to the public.

erred when it declined to grant defendant's motion/demurrer under Article I, section 27.[29]

For these reasons, I dissent.

Brewer, C. J., joins in this dissent.

---

[29] As a result of my determination that the city's ordinance violates Article I, section 27, I need not reach the issue raised by defendant under the Second Amendment. Additionally, the city does not propose a narrowing construction of its ordinance in an effort to render it constitutional.